(49 Misc. Rep. 8.)

### NEW YORK AUTOMOBILE CO. v. FRANKLIN et al.

(Supreme Court, Special Term, Onondaga County. December, 1905.)

1. MASTER AND SERVANT—RIGHT TO RESULTS OF SERVANT'S LABOR—MODELS MADE AFTER TERMINATION OF EMPLOYMENT.

A mechanical engineer, who had devised a model for a machine, was employed by a corporation under an agreement that the corporation might patent any inventions of the engineer. Thereafter, the engineer constructed a second model and afterward, because of the inability of the corporation to pay his salary, resigned and began work for persons who had been previously interested in the corporation, one having been a director therein. The other person had had negotiations with the corporation as to becoming its manager and during such negotiations had offered to construct another model, and turn it over to the corporation upon being reimbursed for its cost if he should become manager. This new model was constructed, and thereafter the corporation demanded that it be turned over to it. The engineer, after leaving the service of the corporation, made a fourth model involving no patentable novelty and turned this together with patents and drawings used in making it, over to a new corporation. Held, that the original corporation could not enjoin the cor-

poration last organized from using the designs of the engineer or to re-
quire an accounting for profits.

**2. CORPORATIONS—DIRECTORS—ENGAGING IN COMPETITIVE BUSINESS.**

    A director of a corporation owes no duty to the corporation not to en-
gage in a similar business after severing his connection with the corpora-
tion.

    [Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations,
§§ 1350, 1351, 1399.]

**3. CONTRACTS—CONSIDERATION.**

    Where a person during negotiations relative to becoming manager of a
corporation, stated that he would construct a model of the machine and
turn it over to the corporation in case he became manager, such promise
was a mere voluntary one not enforceable on failure of the negotiations.

**4. ACCOUNT—ACTION IN EQUITY—LACHES.**

    Where a person negotiating with a corporation as to becoming manager
thereof agreed to construct the model of a machine to be turned over to
the corporation in case he should become its manager, which machine was,
in fact, used by another corporation after termination of the negotiations
referred to, the first-mentioned corporation could not, after a lapse
of more than three years, maintain an action to compel an accounting for
profits earned by the use of the model by the other corporation.

Action by the New York Automobile Company against Herbert H.
Franklin and others. Judgment for defendants.

Lewis & Crowley, for plaintiff.

Stilwell, Stilwell, Kelly & Viall (Arthur E. Parsons, of counsel), for
defendants H. H. Franklin and H. H. Franklin Mfg. Co.

King, Waters & Page (John W. Suggett, of counsel), for defendant
Alexander T. Brown.

Hancock & Hogan, for defendant John Wilkinson.

ANDREWS, J. John Wilkinson is a mechanical engineer. For
some time he had been interested in automobiles and, finally, on Sep-
tember 19, 1899, he entered into a partnership contract with Frederick
D. White, Arthur R. Peck, and Ernest I. White. He agreed to devote
his time to the construction of an automobile, the others to ·contribute
the amount necessary for that purpose. Some work on a model had
already been done. This was now continued and the model was com-
pleted about January 1, 1900. Experiments showed that it was not
altogether satisfactory, but the parties seem to have believed that there
was promise of final success.

Accordingly, on March 6, 1900, the New York Automobile Com-
pany was incorporated for the construction of automobiles. The part-
nership turned over to it whatever property it owned and received stock
in return. Others likewise invested, among them the defendant Alex-
ander T. Brown, who became a director. Mr. Wilkinson was not only
a director, but he was hired by the month or week, at a fixed salary,
and he agreed that, so long as he remained in the employment of the
company, he would grant it the privilege of taking out patents at its
expense upon all his discoveries and inventions with regard to motor
vehicles. And he further agreed that whatever work he did in connec-
tion with such inventions should be considered a part of his regular
employment as superintendent and engineer of the company. At once
Mr. Wilkinson began new drawings and the construction of a second

model to supply the defects in the first.   It was completed and running by June, 1900, and seems to have been more successful than the first model.   At least, Mr. Wilkinson reported to the directors in September that his experiments had so far succeeded that the automobile was then in a marketable condition and that it did its work regularly and satisfactorily.   Mr. Brown is also said to have expressed approval of the design.   Just what occurred is in dispute.   The plaintiff claims that, after the report was presented, the directors determined to manufacture machines, and appointed a committee to buy machinery and secure a site.   The defendants say that Messrs. Wilkinson & Brown both told the directors that it would be necessary to build still a third model.   The minutes simply show that, on October 5, a committee was appointed to report on the cost of machinery necessary to equip a plant, and that a committee on sites was directed to report at the next meeting.   The minutes further show that, on October 12, the committee on machinery reported that it would cost about $10,000; and the committee on sites reported several places that could be secured.   At the same meeting, the engineer was instructed to proceed with the construction of an experimental motor, according to the designs of Alexander T. Brown.   So far as appears from the evidence, no further move was made by the corporation in the way of purchasing machinery or securing a site.   The impression left on the mind is that whatever was thereafter done was largely in the line of attempts to raise additional capital so that business on a commercial scale might be attempted.   It seems that the amount of cash contributed by the stockholders did not exceed $6,000 or $7,000.

Beginning in October there was talk of engaging a manager.   During the winter a Mr. Bretz was spoken of.   He was unavailable and, finally, Mr. Brown suggested the defendant, H. H. Franklin.   Meanwhile, nothing seems to have been actually done toward building the Brown motor.   Mr. Wilkinson spent his time in testing, altering, and perfecting his own model and studying the improvements that could be made.   This went on until June 30.   At this time his salary was some five months in arrears.   He had several times threatened to resign if he were not paid.   He was not paid, and finally, on the date mentioned, he sent his written resignation of the position of engineer to the plaintiff.   The two models which Mr. Wilkinson had built were four-cylinder, air-cooled, gasoline engines, with two cylinder auxiliary air engines attached.   They differed considerably between themselves. The air engines were not successful, and they were removed, about September 1, 1900, from the second model.   Neither of these engines was novel or patentable.   Such engines had long been known; and, while there may have been some rearrangement of the parts, that was all.   There was no invention.   Nor does the second engine seem to have been so far perfected as to have been practical for automobile use.   When Mr. Wilkinson left the plaintiff's employment, these two models were stored in the yard of a machine shop.   They are still there, and apparently, have always been subject to the plaintiff's orders.   The plans and drawings were left in the room of the White Building, where Mr. Wilkinson did his work, and have been lost.   The patterns were left at the foundry.

As has already been stated, Mr. Brown, some time during the winter or spring of 1901, suggsted Mr. Franklin as manager for the plaintiff. This suggestion resulted in several interviews between Mr. Franklin and the plaintiff's officers. The time when they began is in dispute. In view of the letters in evidence, however, I am inclined to think that Mr. Franklin is correct in his recollection, and that the first was not before July 1. Negotiations continued between these parties until, apparently, the end of August. It was suggested that Mr. Franklin become manager, that he buy out the plaintiff, that the plaintiff and the Franklin Company, in which both Mr. Franklin and Mr. Brown were interested and directors, should be consolidated. Nothing came of these negotiations. During the course of them, the plaintiff claims that Mr. Franklin said that no time should be wasted in continuing the plaintiff's work, that another model was required, that he would go on at once and build one and then, if any agreement was made, he would return it to the plaintiff on being repaid what it had cost. I am inclined to believe that this claim is well founded. Mr. White and Mr. Peck both testify to the agreement. Mr. Franklin does not distinctly deny it. He admits that Mr. White claimed that such an agreement had been made, and claimed its fulfillment, in September, when negotiations finally ended. His letter, also, to Mr. Will, of August 27, shows a belief that he might be repaid for the work done. All sides concede that, when Mr. White made the demand that has been mentioned, Mr. Franklin refused to comply with it. Meanwhile, Mr. Wilkinson had been at work. On July 1, the day after his resignation, he first saw and talked with Mr. Franklin. Two or three days later he entered into the employ of Mr. Franklin and Mr. Brown, who had formed a partnership to manufacture automobiles. Mr. Wilkinson did not have with him the patterns or drawings which he had prepared for the plaintiff, nor did he use them in any way. Undoubtedly his familiarity with them would have enabled him to reproduce them from memory; but, as a matter of fact, he did not do so. He prepared, on consultation with Mr. Brown, new and different drawings. It is true, they represented a four-cylinder air-cooled gasoline engine, but practically every measurement was altered, so too were some of the minor fittings and arrangements. These plans were furnished September 1st, and the model itself October 1st.

On November 18 the Franklin Company purchased of Brown and Franklin the automobile business carried on by them, their good will and all their personal property for $50,000 of its capital stock. The tangible property covered by this purchase was represented, substantially, by the model made by Mr. Wilkinson. Mr. Wilkinson continued in the employ of the Franklin Company. The Brown and Franklin model was not deemed sufficiently perfect, and he began another one. Again, in consultation with Mr. Brown, he drew new and different plans; new patterns, except for the piston, were also made. Later, there was still a further change by replacing the cylinders with others of a new design. This model finally proved satisfactory. The first complete machine was put on the market in the spring of 1902; and, since that time, the Franklin Company has built up a large business. It has advertised extensively, claiming to be the original American makers

of four-cylinder, air-cooled cars. Upon this state of facts the plaintiff asks that the defendants be enjoined from making and selling such an automobile, and from using any of the designs or inventions of John Wilkinson, and that they account for any profits made by reason of the same. No such relief can be granted in this action.

Mr. Wilkinson, as an employé of the plaintiff, had, under the circumstances, a right to leave its service when he did. Concededly, he had no right to take with him any of its tangible property, such as the model, the patterns, the drawings; and he did not. Possibly he had no right to use any designs which he might remember, and this he did not do. But he, as well as every one else, had a right to plan and use a four-cylinder, air-cooled engine. His experience, his skill, his unmatured thoughts and designs were his own. That they had been gained at the expense of the plaintiff certainly gave the latter no legal right to them. If it had possessed any unpublished inventions which Mr. Wilkinson was now using, another question would arise. But it had not. All it possessed on the 30th of June was an unperfected model of an engine; and this it still has. Nor have Mr. Wilkinson and Mr. Brown wronged it by any act as directors. True, the one, after he left the plaintiff, began at once to build a four-cylinder engine for the other, and this was ultimately sold to a corporation of which they were both directors. But I know of no rule which prohibits a director of a corporation engaging in a business similar to that carried on by the corporation, either in his own behalf or for another corporation of which he is likewise a director. True, he owes to his stockholders the most scrupulous good faith. He may not deal with the trust property for his own advantage. He may not deal in his own behalf in respect to any matter involving his rights and duties as a director. He may not seek his own profit at the expense of the company or its stockholders. But, so long as he violates no legal or moral duty which he owes to the corporation or its stockholders, he is entirely free to engage in an independent competitive business.

In the case at bar, Mr. Brown might very well have wronged the plaintiff if, while acting as a director, he had enticed Mr. Wilkinson away from its service. He would have wronged it if he had been intrusted with the duty of re-engaging Mr. Wilkinson for its service and had then engaged him for his own. But where, as in this case, Mr. Wilkinson was a free agent, having rightfully left the plaintiff's employment; where Mr. Brown was intrusted with no duty with regard to him; where, so far as the evidence shows, there even seems to have been no desire on the part of the plaintiff to re-engage Mr. Wilkinson, Mr. Brown violated no duty to the corporation or to its stockholders in engaging Mr. Wilkinson to enter into his own service. Finally, claim is made that relief should be granted because Mr. Franklin broke his promise to build a new model and turn it over to the plaintiff at cost. I shall assume that Mr. Brown is to be charged with the knowledge of this promise, either because he was a partner of Mr. Franklin, if the promise was made after the inception of the partnership, or because he was present at a meeting of the directors of the plaintiff when it was made. I cannot hold, however, as claimed by the plaintiff, that the relation of principal and agent existed between it and Mr. Frank-

lin, or that the rules applicable to agency apply to the circumstances in
this case. Consequently, if this promise is material here, it is because it
constituted a contract between the plaintiff and Mr. Franklin, or the
firm of Brown & Franklin. I do not think that it did. As has been
held, the building of this third model in no way violated the plaintiff's
property rights. Its consent was not required. It had lost Mr. Wilkin-
son, and had no control over his actions. There was no consideration
on Mr. Franklin's part, nor was there any reciprocal promise on the
part of the plaintiff. I do not see, also, that the fact that Mr. Brown,
who, at some time, entered into a partnership with Mr. Franklin, who
was a director of the plaintiff, alters the situation in the slightest. The
mere voluntary promise of a director to his corporation is no more bind-
ing than the voluntary promise of a third person. There must be
something else—a contract, consideration, estoppel.

There is a third objection, so far as the Franklin Company is con-
cerned. The third model was never used. What it is manufacturing
is still a fourth model, unlike the third, which Mr. Wilkinson had every
right to build, whether the third model belonged to the plaintiff in
whole or in part or not. The third model resulted in no profits what-
ever. If it had been delivered to the plaintiff Mr. Wilkinson would
have built the fourth model precisely as he did. There was nothing
in the third model patentable, nothing secret, nothing not open to the
world. Its only value was the knowledge which its faults and defects
gave to Mr. Wilkinson of difficulties to be overcome and the means of
overcoming them. Finally, it appears that this action was not begun
until November 28, 1904. If the plaintiff desired to compel the defend-
ants to account for the profits which have arisen from their subse-
quent experiments and the large expenditures necessarily made by
them, proceedings should have been begun with less delay.

I have examined with care the cases called to my attention by the
plaintiff, and I find nothing in them to alter my views. The three up-
on which the greatest stress is laid are Keokuk Packet Co. v. David-
son, 95 Mo. 467, 8 S. W. 545; Averill v. Barber, (Sup.) 6 N. Y. Supp.
258; and Blake v. Buffalo Creek R. R. Co., 56 N. Y. 485.

In Keokuk v. Davidson, it appears that the plaintiff tried to obtain,
through Davidson, its president, a contract for carrying mails for the
United States government, but failed. Subsequently, Davidson ob-
tained such a contract with himself, personally. The court lays down
the undoubted proposition that the directors of a corporation "will not
be allowed to deal with the corporation funds and property for their
private gain. They have no right to deal with themselves and for the
corporation at the same time and they must account for the profits
made by the use of the company's assets and for moneys made by a
breach of trust." Having these principles in mind, the court further
says that Mr. Davidson, as president of the packet company, having
endeavored to get these mail contracts for the company and having
failed, was not forbidden from making a contract in his own behalf;
but, having done so, "his relation to the packet company required that
he should use all the facilities afforded by the packet company in per-
forming the contract and, under the principle above announced, he will
not be allowed to make profit out of such use, but will be held to ac-

count to the company for all that he received for the service performed by the company in such use." After a certain time, however, the boats of the company no longer performed service in carrying mails, and the defendant is not accountable for any sums received by him after that time. Precisely what the court had in mind is not quite clear. It can hardly be that a director, intrusted with the duty of making a specific contract for his company, can be allowed to act in his own behalf and defend himself, when called to account, by the claim that he could not succeed in obtaining a contract for his company. Assuming that he has that right, however, as the court assumed it, it cannot be that, because he happens to be the president of a transportation company, he is bound to patronize his own company. But, if he does patronize such company, the fact that he is its president should not make him liable for more than the services are actually worth. Finally, the statement that the defendant is not accountable for any sums received by him after the plaintiff had ceased to carry the mails, enforces the idea that the court did not consider the contract as one which he must be held to have taken in behalf of the plaintiff, because of his relations to it.

In Averill v. Barber the defendants were directors of the American Company, and the court says: "It is not necessary to cite authorities to the proposition that, if they were under a duty or obligation of any kind to get control of the patents" involved in the litigation "for the benefit of the American Company, they could not do so for their individual benefit." This must, of course, be conceded. It then proceeds to discuss the question whether there was any such duty or obligation, and under the peculiar circumstances of that case it holds that there was.

In Blake v. Buffalo Creek R. R. Co. Campbell and Mills were directors of the defendant. As such, the duty of constructing the railroad and obtaining the right of way for it rested upon them. Under such circumstances they obtained, to themselves personally, a lease from the city of Buffalo of certain lands over which the railroad tracks had already been laid with their knowledge and consent. The court held that the defendants could not release the lands to the railroad for a much larger sum than they paid the city. It was a manifest and clear breach of trust. In other words, these cases all hold that, if a director or trustee violates the duties which he owes to the corporation, the courts will intervene. But, in this case, I expressly hold that no such rights or duties were, in fact, violated. The complaint must be dismissed, with costs.

Proper findings may be prepared and, if not agreed upon, will be settled upon due notice.

Complaint dismissed, with costs.