Edward J. Schulenburg, et al., Copartners d/b/a Time-O-Matic, Company, and Time-O-Matic, Inc., a Corporation, and E-S Industries, Inc., Plaintiffs-Appellees, v. Signatrol Inc., a Corporation, John W. Sutphin, et al., Defendants-Appellants.

Gen. No. 10,510.

Fourth District.

July 23, 1964.

Gunn, Hickman and Kesler, of Danville (William R. Kesler and Horace E. Gunn, of counsel), for appellants.

Acton, Baldwin, Bookwalter & Meyer, of Danville (D. S. Baldwin, of counsel), for appellees.

SMITH, J.

Plaintiffs manufacture and sell devices for automatically making and breaking electrical circuits. Such devices known in the trade as flashers are used in display signs where changing light patterns or a flashing effect is thought desirable. Plaintiffs were first in the field, at least they were there before defendants, all of whom are former employees who left to form their own competing company, Signatrol, also a defendant. For our purposes we can group defendants as one as we can the various plaintiffs. The lower court issued an injunction restraining defendants from the further manufacture and sale of competing flashers, in effect, putting them out of business and they appeal. Damages, if any, are postponed pending the outcome here.

Plaintiffs say that their manufacturing "know-how" is a trade secret which was imparted in confidence to defendants while employees and that such secret has been used by them in manufacturing a competing product. Defendants deny utilization by them of any such secret, in fact, they deny its very existence. All they used, they answer, were acquired skills and such general knowledge of the operation as the law permits them to take away.

██ Plaintiffs' trade secret, if it is, is to be distinguished from the product itself in which they have no property right, being devoid of patent protection. The electrical principle involved is well known and

404

plaintiffs' product is for sale and anybody can buy it. For that matter anybody can duplicate it if they want to and can and go into business. Competition is considered a very good thing (in the flasher business), but those who choose to go, must use fair means, not foul. If fair means are used the field is wide open to all comers for the owner of a trade secret as distinguished from the owner of a patent has no right as such to exclude others from using it. Relief is only granted when someone attempts to use the secret in violation of some general duty of good faith such as an abuse of confidence. Such an abuse results in unfair competition and equity will then intervene if called upon.

■ ■ Assuming possession of a trade secret by plaintiffs, assuming its disclosure in confidence to defendants while employees, assuming its profitable use thereafter by them to plaintiffs' financial detriment, is this unfair competition? Posited thusly, the answer is immediately apparent. Misuse of confidential information by erstwhile employees as a weapon of attack upon their former employer is indeed unfair competition for it shocks one's sense of fair play. Even in times gone by, when the law took a less jaundiced view, such conduct was not defended upon the ground that it was fair. Lord Kenyon in Nichols v. Martyn (2 Esp 732) characterized such conduct as "not handsome," but yet for his time not contrary to law. It is for ours without meaning to cast aspersions on a more freewheeling age. Other courts and writers are of this concensus. In Franke v. Wiltschek, 209 F2d 493, it was stated:

> "But the tendency of the law, both legislative and common, has been in the discretion of enforcing increasingly higher standards of fairness or commercial morality in trade. The tendency

405

still persists. The present case surely is not one where we are disposed to attempt to reverse the trend."

Misuse of confidential information, because it can result in unfair competition, is said to be violative of an implied condition that "he will not after the service is determined use information which he has gained while the service has been subsisting to the detriment of his former employer." Essex Trust Co. v. Enright, 214 Mass 507, 102 NE 441. To sum up—misuse of confidential information or breach of an implied condition are but text in the larger context of unfair competition and such competition can run afoul of the equitable doctrines which condemn fraud and overreaching. For our context the rule is, that an employee lawfully entering upon a competing business may be enjoined from using trade secrets of his employer's business obtained during the course of his employment.

 Obviously all knowledge acquired by an employee does not partake of a trade secret. His relationship to his employer may be confidential, but not the knowledge. That which by experience has become a part of a man's general knowledge cannot and ought not to be enjoined from further and different uses. Again, in Junker v. Plummer, 67 NE2d 667 (Mass 1946) the rule is stated thusly:

"The law is well settled that an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of the employment. (Citing cases.) But it is equally well established that out of the 'relationship of employer and employee certain obligations arise, including that which precludes an employee from using, for his own advantage or that of a rival and to the harm of his

406

employer, confidential information that he has gained in the course of his employment.' "

All would agree that equity should not restrict the subsequent use of general skills and knowledge and this for the reason that such use simply does not shock one's sense of fair play. But the line between the useable and the nonuseable is hard to draw. Overstrict, we create a monopoly of first users—a very bad thing in our society, if we acknowledge the desirability of encouraging individual business enterprise and initiative which we do. Plaintiffs agree:

> "We do not question or dispute this right (to enter into a competing business) in the defendants. However, there was a legal and an illegal method open for adoption by defendants in preparing to enter into such competing business and producing products in competition with their former employer and defendants deliberately chose the illegal method."

This method, they say, took the form of either copying or memorizing their "know-how" on blueprints during the time they were employed and putting it to use in manufacturing a competitive product.

██ We thus come to grips with the central question presented by this appeal. Was there a "trade secret"? In defining these two words we need not be concerned, as we are elsewhere, with searching for some esoteric meaning for none exists, though for a play on words, the information to be "secret" must be "esoteric" in the sense of being restricted to an inner circle. As there are two words there are two aspects. It must be secret and the secret must relate to business (trade). Formulae, lists, patterns and blueprints are examples. To be secret means that a blueprint, for example, is not in the public domain through

divulgence and that it is not too easily discoverable; that is, apparent to all without too much hard work.

■ ■ Was plaintiffs' blueprinted "know-how" a secret? Well, they considered it a secret and attempted reasonably to keep it so (without much success), and their intent and attempt, we suppose, are of importance in answering the question. It *was* imparted privately to a select few—defendants among them. That the secret was spied out does not make it any less a secret nor does the fact that their finished product was on the market amount to either a divulgence or an abandonment of such secret. In Smith v. Dravo, 203 F2d 362, it was said:

> "But this (publicity material) was not equivalent to a disclosure of the structural design, the engineering details, of either the container as a whole or its various working parts. This could only be obtained by careful inspection of the article and the drawings."

■ Certainly this secret was one connected with business. In manufacturing their flashers, plaintiffs used an assembling process. The component parts were secured from suppliers and then put together. For each part there are very precise drawings or blueprints showing the dimensions and metalogical specifications. These are furnished the suppliers. We agree with the court below that the information, measurements, designs, and material specifications contained on these blueprints or drawings and used in the manufacturing process qualify as a trade secret in view of the fact they were kept confidential. We have thus answered our first question—plaintiffs were possessed of a trade secret.

■ We arrive at the final question of use by defendants, which like our first query, has two points.

408

Were the blueprints copied or memorized, and if so, did defendants utilize such knowledge in producing a competitive product. First off, let it be said that the question of means, whether copied or memorized, is immaterial to a proper conclusion as distinguished from irrelevant. Either is a taking. In logic why should plaintiffs be entitled to less protection if their secret was memorized rather than copied? The question answers itself. Copying has obvious advantages since memory does play tricks, but if enough is remembered it will certainly do. In this voluminous record there is ample evidence of copying, very good evidence indeed, and there is even better evidence, almost an agreement, that defendants did memorize the salient details. There is likewise substantial evidence that they drew on both in making up their blueprints and that such were used by them in the same manner as plaintiffs used them. This is enough for injunctive relief. The court below, in an excellent memorandum opinion, said this:

> "By defendants' own statement they carried away from plaintiffs mental pictures of the plaintiffs' drawings, and specifications, and from that mental picture they reproduced it upon paper— an accurate copy of the original. It was no more or less than a copy made from the original. . . . The human eye is but a photographic lens, and the mind is the film. Through the lens the object is exposed to the sensitive film, the mind. . . . These mental pictures were obtained while in plaintiffs' employment, and to carry them away in this manner was a violation of a confidence reposed in them by their employer, as if they had made copies or photographs and carried them away."

Nor does it make any difference that defendants need not have taken the course they did in getting their business going. The fact of the matter is, they did use plaintiffs' secret and thus gained a distinct advantage. For defendants to have manufactured an identical flasher minus plaintiffs' secret would have been a laborious and expensive process. There would have been need for a metalogical analysis, precise measuring, and doubtless after that, a period of trial and error. We quote from an analogous situation in Tabor v. Hoffman, 118 NY 30, 23 NE 12, involving molding patterns:

> "The pump consists of many different pieces, the most of which are made by running melted brass or iron in a mold. The mold is formed by the use of patterns, which exceed in number the separate parts of the pump, as some of them are divided into several sections. . . . The size of the patterns cannot be discovered by merely using the different sections of the pump, but various changes must be made and those changes can only be ascertained by a series of experiments, involving the expenditure of both time and money. Are not the size and shapes of the patterns, therefore, a secret which the plaintiff has not published and in which he still has exclusive property? Can it be truthfully said that this secret can be learned from the pump when experiments must be added to what can be learned from the pump before a pattern of the proper size can be made? As more could be learned by measuring the patterns, than could be learned by measuring the component parts of the pump, was there not a secret that belonged to the discoverer until he abandoned it by publication, or it was fairly discovered by another?"

410

The lugubrious chore of duplicating each part from a model was circumvented by defendants with copies of plaintiffs' blueprints in hand. That defendants could have traveled a legal route, is beside the point. They chose a short cut and in doing so are accountable in equity. Franke v. Wiltschek, 209 F2d 493, 495, noted above, is apropos:

> "Defendants argue that the heart of plaintiffs' process was revealed by an expired patent, and that the improvements thereon were unpatentable applications of mechanical skill. This totally misconceives the nature of plaintiffs' right. Plaintiffs do not assert, indeed cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment. This duty they have breached."

And again in Vitro Corporation of America v. Hall Chemical Co., 254 F2d 787, at page 793:

> "The fact that Hall's trade secrets could have been discovered just as he discovered them, by extensive and painstaking experimentation, which led from known factors to an ascertainable result, does not destroy the value of the discovery nor eliminate the liability of Vitro."

The short cut used by defendants enabled them to compete with plaintiffs on equal terms by sparing

411

them the necessity of spending time and money in acquiring the "know-how." Competition is a desideratum in our economic system, but it ceases to serve an economic good when it becomes unfair. The concept of fair play should not be shunted aside on the theory that competition in any form serves the general good. Only *fair* competition does that. Unfair competition is not competition at all in the truest sense of the word. We see no good purpose in condoning defendants' conduct by lifting the injunction. If defendants are now out of business they can only blame themselves. They were not born that way but got that way on their own. It may be that in getting there, they did not know of the consequences, of the duty equity would impose on them, but this is a mistake of law. Defendants' action, therefore, cannot be excused, nor can it be condoned, as we have said. We therefore hold that the use by defendants of plaintiffs' trade secret, whether copied or memorized, made known only to them as employees in the furtherance of plaintiffs' business may not now be used by them in a competing business of their own.

The injunction is indeed drastic, but they always are. We do not see how we can make it any less sweeping and yet give to plaintiffs their just due. The order appealed from is accordingly affirmed.

Affirmed.

CROW, P. J. and SPIVEY, J., concur.