**G T I CORPORATION, Plaintiff,**

v.

**Rollin G. CALHOON, Harold L. Davis, Robert G. King, Metpar Manufacturing, Inc., Defendants.**

No. 68-207.

United States District Court,
S. D. Ohio, E. D.

Nov. 28, 1969.

N. Hart Cohen, Steubenville, Ohio, Walter T. McGough, Charles C. Cohen, and Roger C. Wiegand, of Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff, Patrick E. Dressler and John S. McGeeney, of Cummings & Lockwood, Stamford, Conn., of counsel.

Lyman Brownfield, Columbus, Ohio, for defendants Calhoon, Davis, King and Metpar Mfg., Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, JUDGMENT

WEINMAN, Chief Judge.

The Court, having considered the evidence presented at the trial of this action and the briefs and arguments of counsel, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff GTI Corporation ("GTI") is a Rhode Island Corporation with its principal place of business at Meadville, Pennsylvania. Defendants Calhoon, King and Davis are individuals residing in Nelsonville, Ohio and defendant Metpar Manufacturing, Inc. is an Ohio Corporation with its principal place of business at Nelsonville, Ohio.

2. GTI acquired a plant which was nearing obsolescence by industrial standards, at Hadley, Pa., from Beal Brothers Co., Inc. in September of 1965.

At the time of said acquisition, the equipment at the Hadley Weld Plant was inferior to the machinery of Sylvania and further modifications were required to render the equipment capable of producing the types of welded metal products manufactured by Sylvania. GTI acquired the Hadley Weld Plant with a view to converting the equipment to pro-

duce dumet-to-dumet welded leads and moly-to-dumet welded leads so that it could compete with Sylvania in this field.

3. Defendants, Calhoon, Davis and King were employed by plaintiff respectively in March and September, 1965 and January, 1966. *Each individual defendant left the employ of Sylvania Electric Products Co. in order to work for plaintiff.*

4. Plaintiff employed defendants Calhoon, Davis and King in the respective capacities of Plant Manager, Project Engineer and Chief Engineer.

5. Plaintiff employed defendants Calhoon, Davis and King *for the purpose of bringing Sylvania capabilities in the manufacture of welded stud leads to plaintiff's Hadley Plant.*

6. Prior to employment by plaintiff, defendants Calhoon, Davis and King had been employed by Sylvania 19, 12 and 15 years respectively. Before that, defendant Calhoon had been employed by General Electric for eight years and *defendant Calhoon, while at Sylvania, had discovered the process now used by plaintiff and the industry for welding moly-dumet stud leads.*

7. In early March, 1965 while defendant Calhoon was employed by Sylvania, Marshall Smith, General Manager of plaintiff's Saegertown division wrote Calhoon offering him employment. The letter offering employment did not reveal that plaintiff would require Calhoon to execute an Employment Agreement as a condition of employment. In reliance upon plaintiff's offer, Calhoon gave Sylvania notice that he was terminating his employment. When Calhoon reported for work at the Saegertown plant on March 22, 1965, he was informed, for the first time, that he was required to execute an Employment Agreement.

8. On March 22, 1965 defendant Calhoon signed an Employment Agreement which so far as is pertinent provided:

"The employee hereby agrees to disclose fully to the Company immediately upon origination or acquisition thereof, any and all inventions, discoveries, improvements * * * discovered, developed or secured by him; solely or jointly with others or otherwise, during his employment by the Company and during a period of five years after the termination of such employment * * * which may be directly useful in, or related to, the composition, manufacture, production, sale, application or use of any and all manner of machinery for the manufacture of parts of solid-state electronic components or semiconductors and any other article or articles of like or similar matter, or any other article or articles used by, sold or manufactured by the Company * * *. The employee hereby agrees that at all times, both during his employment and after termination of his employment he will keep secret all processes, inventions and formuli made known to him by the Company * * *."

9. In September of 1965, Calhoon was assigned as Plant Manager of the Hadley Weld Plant and was given the responsibility of renovating the equipment at said Plant and bringing the equipment up to Sylvania standards.

10. To assist in improving the weld machine capabilities of the Hadley Weld Plant, Calhoon caused GTI to employ defendant Harold L. Davis on September 20, 1965 as Project Engineer. Davis signed an Employment Agreement on that date which provided, among other things, that "I will * * * promptly *disclose* and assign to GTI * * * any and all *ideas, improvements and inventions,* patentable or unpatentable, *which I have made* or may hereafter make, alone or jointly with others, relating to or suggested by GTI's business * * * between the date of my employment by GTI and the date of termination of my employment * * *."

11. Upon Calhoon's recommendation, GTI hired defendant Robert G. King as Manager of Engineering for the Hadley Weld Plant in order to obtain his knowledge and experience in the renovation of

machinery that would produce welded leads of the type produced by Sylvania. King signed an Employment Agreement on January 3, 1966 (the form of which is identical to that executed by Davis) and assumed his duties on that date.

12. Effective March 29, 1968, defendants Calhoon, Davis and King terminated their employment with plaintiff as the result of a management decision by the plaintiff overruling defendant Calhoon as Plant Manager with respect to the position and responsibilities of defendant Davis.

13. During their employment by plaintiff, defendants Calhoon, Davis and King built the Hadley welding machines, which were the same basic machines as those used by Sylvania, to equal the Sylvania capability, and in the course thereof continued their learning process with respect to the design and use of stud lead welding machines.

14. During their employment by plaintiff the individual defendants who were hired by plaintiff from its competitor Sylvania to introduce Sylvania know-how into the Hadley plant did not acquire any confidential information or trade secrets from plaintiff with respect to the design, manufacture or use of stud lead welding machines. The individual defendants brought their knowledge and experience acquired during their employment by Sylvania to plaintiff's Hadley Weld Plant. During the two and one-half years of their employment with plaintiff, defendants Calhoon, King and Davis successfully renovated between fourteen and sixteen Hadley Plant weld machines to meet Sylvania capabilities. While employed by plaintiff the individual defendants did not draft specific plans or blue prints or conduct experiments for the development of the Metpar machine.

15. On April 1, 1968 the individual defendants, commencing operations as Metpar Manufacturing, Inc. entered the business of manufacturing to buyer's specifications welded stud leads similar in specification and identical in purpose to the leads manufactured by the plaintiff, Sylvania and others.

16. After March 29, 1968 the defendants, working sixteen hours a day seven days a week designed and built a percussive stud welding machine for the purpose of their business and began to successfully produce welded stud leads about June 11, 1968.

17. The Metpar welding machine which the defendants designed and built after leaving their employment with plaintiff contained some features which were improvements over the machines used by plaintiff.

18. The defendants' machines were designed primarily by defendant King and built by defendants Calhoon, Davis and King.

19. During the time of their employment by plaintiff the individual defendants did not draft specific plans or detailed blue prints embodying the features of the Metpar weld machine. The features of the Metpar machine were designed and the machine built after the individual defendants terminated their employment with plaintiff.

20. The individual defendants had a total of 59 years experience in the field of stud lead welding machines as a result of their previous employment with Sylvania, General Electric and others. In designing and building the Metpar machine they relied upon their general knowledge and experience and did not receive the knowledge necessary to design and build the machine as a result of their employment with plaintiff.

21. The individual defendants did not conceive, develop or design the features of the Metpar machine while they were employed by plaintiff and did not fail to disclose to plaintiff any material information acquired or developed by them while in plaintiff's employ.

22. The stud lead welding machine designed and built by defendants is similar to such machines in common use throughout the industry originally patented and now in the public domain and

does not utilize any design or process secret to plaintiff or in which plaintiff has any exclusive or proprietary interest.

23. Upon termination of his employment with plaintiff, defendant Calhoon took with him but later returned to plaintiff, a telephone directory containing the names and telephone numbers of customers. The customers in the directory were well known in the semiconductor industry and defendant Calhoon was acquainted with these customers through his association with Sylvania. The information contained in the telephone directory was in the public domain and was not secret and proprietary to plaintiff.

## DISCUSSION

In this action plaintiff seeks an injunction restraining defendants Calhoon, King and Davis, its former employees, from utilizing trade secrets claimed to belong to plaintiff and directing the assignment to plaintiff by defendants of any ideas or improvements which one or more of them may have made relating to plaintiff's business.

The present case is distinguishable from the usual case in which alleged trade secrets are given judicial protection. This is not a case where plaintiff developed a particular machine or a different machine; nor is this the type of case where the plaintiff possessed any confidential knowledge or information with reference to this machine; this is not a case where the plaintiff company had possession of secret formulae, designs, drawings, blueprints, patterns, devices, studies and compilations of information acquired over a period of years from independent research, investigation or from intercompany exchanges of information which were given to defendants in confidence; this is not a case where the employees breached a confidential relationship by removing and using secret formulae, designs, drawings, patterns, devices and studies upon termination of their employment. The present case, however, involves a situation where the plaintiff took from its competitors the information necessary to copy the machines used by its competitors. This is the kind of a case where the plaintiff by its action in hiring the defendants from Sylvania did not consider the knowledge and experience of the defendants and the designs of the machines of the other competing companies as trade secrets.

This is the kind of case, however, where there was a lack of proof that any features complained to be trade secrets by plaintiff were conceived and developed by defendants during their employment by plaintiff. Further, there was a lack of proof that the machines later designed by defendants utilized trade secrets. Whatever improvements may have been made were merely additions to machines well known in the business.

■ In order to establish its cause of action for wrongful appropriation of trade secrets plaintiff must establish by the preponderance of the evidence (a) the existence of a trade secret (b) acquisition of the trade secret as a result of a confidential relationship and (c) the unauthorized use of the secret. E. W. Bliss Company v. Struthers-Dunn, Inc., 408 F.2d 1108 (C.A. 8 1969).

■ An owner may or may not be able to restrain use of knowledge retained in the memory of a former employee. First, a court could not enforce such a restraint. Fairchild Engine and Airplane Corporation v. Cox, Sup., 50 N.Y.S.2d 643. Second, such restraint would be unduly harsh. New York Automobile Co. v. Franklin et al., 49 Misc. 8, 97 N.Y.S. 781. Third, a court has no power to compel an employee to erase from his mind knowledge which he has acquired from his employer. Nor is the employee required to search his mind for all thoughts relating to the employer's business and thereafter be precluded from employing such thoughts when they are not trade secrets. Koehring Company v. E. D. Etnyre & Company, Inc., 254 F.Supp. 334.

However, where an employee acquired all his knowledge from his former employer through his use of plans, processes, tools, mechanisms and components which are trade secrets, a court will protect the trade secrets of the former employer.

The defendants take the position that the plaintiff has failed to prove that they utilized trade secrets belonging to plaintiff in the design of the Metpar welding machine. As a defense the defendants assert that they utilized their general knowledge and experience in designing and building the Metpar welding machine after they terminated their employment with plaintiff.

A trade secret may be defined as:

"[A]ny formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. * * *" B. F. Goodrich Company v. Wohlgemuth, 117 Ohio App. 493, 192 N.E.2d 99, 104 (1963).

A trade secret does not embrace all corporate information. An employer is only entitled to restrain a former employee from disclosing and using confidential information which was developed as a result of the employer's initiative and investment and which the employee learned as a result of the employment relationship. In any trade secret case involving the alleged wrongful appropriation of trade secrets by former employees the Court must reconcile the conflicting rights of an employer to enjoy the use of secret processes and devices which were developed through his own initiative and investment and the right of employees to earn a livelihood by utilizing their personal skill, knowledge and experience.

In Allis-Chalmers Manufacturing Company v. Continental Aviation and Engineering Corp., 255 F.Supp. 645 (E.D.Mich.S.D.1966) the Court stated at page 652:

"Involved in the present proceeding are two apparently conflicting principles of law. On one extreme lies the principle that an individual has the right to change his employment for whatever reason he wishes and the right to utilize his general skill, knowledge and experience for the benefit of his employer. Indeed it is inevitable that some of the knowledge acquired while in the former employment should be made available to the new employer, and courts will not deprive the employee of the right to use the skill he developed through the years. Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D. Cal.1958), aff'd. 283 F.2d 695 (9th Cir. 1960); May v. Mulligan, 36 F. Supp. 596 (W.D.Mich.1939) affirmed 117 F.2d 259 (6th Cir.) cert. denied 312 U.S. 691, 61 S.Ct. 622, 85 L.Ed. 1127 (1940).

"At the other end of the spectrum is the law of unfair competition, including trade secrets law, in which the courts seek to enforce increasingly high standards of fairness or commercial morality and to protect the owner of information obtained through the ingenuity and effort of its employees, and its expenditures of time and money. Franke [, et al] v. Wiltschek, 209 F.2d 493 (2nd Cir. 1953); Schulenburg v. Signatrol, Inc. [50 Ill.App.2d 402] 200 N.E.2d 615, 142 USPQ 510 (Ill.App.1964)."

In the case of Official Aviation Guide Company, Inc. v. American Aviation As-

sociates, Inc., 150 F.2d 173 (C.A. 7 1945) the Court stated at page 178:

> "Knowledge confidentially gained in the course of employment may be made the subject of restrictive agreement, but *an employer cannot prevent his employee from using the skill and intelligence acquired through experience received in the course of the employment.* The employee may achieve superiority by every lawful means and upon the rightful termination of his contract use that superiority for the benefit of rivals in business of his former employer."

■ General skill is an employee's personal knowledge based upon his education, ability and experience. The author A. E. Turner states:

> "The distinction between personal skill, knowledge and experience which is not protectable, and nonpersonal, which is protectable, is that the former is general to the trade as a whole, while the latter is particular to the employer concerned." Turner, The Law of Trade Secrets, Sweet and Maxwell, Ltd., London (1962), p. 162.

■ In Head Ski Company v. Kam Ski Company, 158 F.Supp. 919 (D. Maryland 1958) the Court posed two tests for determining whether employees who formed a competing business utilized general knowledge and skill instead of trade secrets of the former employer. First, did the employees derive the necessary knowledge to make their products from their employment with plaintiff or from their general knowledge of the arts of manufacture? Second, could the defendants proceed as they did independently of the knowledge gained as plaintiff's employee? If the answer to these tests is in the affirmative, the former employees relied upon general skill and not upon trade secrets of the former employer.

■ Applying these tests to the facts of the present case it is clear that the defendant employees relied upon their general knowledge and experience in designing the features of the Metpar welding machine and did not appropriate plaintiff's trade secrets.

The evidence shows that defendants Calhoon, King and Davis had a great deal of experience in the field of stud lead welding machines. Defendants Calhoon, King and Davis had respectively worked for Sylvania, 19, 15 and 12 years. Defendant Calhoon also worked eight years for General Electric and King worked five years for Sutters Weld Company. Desiring to enter competition with Sylvania, General Electric and R. G. Thomas in the field of dumet-to-dumet and moly-to-dumet welded leads plaintiff GTI purchased a lead welding plant at Hadley, Pennsylvania. The Hadley plant had machinery which was identical to the basic machinery used at Sylvania but which required modifications before the type of welded lead manufactured by Sylvania and others could be produced there. In order to introduce Sylvania capabilities into the Hadley plant, the plaintiff hired Calhoon, King and Davis from Sylvania.

In this regard defendant Calhoon testified as follows:

> "Q. Now, would you compare the machines in the Hadley Weld Plant with the machine at Sylvania at the time you went with Hadley? * * *
>
> "A. My version of the machine is that they were all, the working parts of the machine are identical with the Sylvania machine. The parts not only identical they are interchangeable and in some cases made to the same prints.
>
> "Q. Then what did they require, modification?
>
> "A. In order to make the product at Hadley that Sylvania was making and Hadley not able to make these machines did require modification to bring them up to the level of the Sylvania machine."

As employees of plaintiff, the defendants successfully renovated the Hadley plant machinery so that leads of the type *produced by Sylvania* could be manufactured at the Hadley plant. The de-

fendants necessarily continued their learning process with regard to the design and use of stud lead welding machines but defendants did not draft blue prints for the Metpar machine or experiment or build the features of the Metpar machine while they were employed by plaintiff. The plaintiff did not disclose to defendants any confidential information concerning the design of stud lead weld machines. On the contrary, defendants brought to plaintiff their know-how in this field acquired during their previous employment and enabled plaintiff to renovate its machines so that plaintiff could compete with General Electric and Sylvania in the production of dumet-to-dumet and moly-to-dumet welded leads.

The individual defendants did not derive their knowledge of the subject of lead welding machines from their employment with plaintiff. Nor did the defendants develop the features of the Metpar machine at plaintiff's plant or on plaintiff's time. The plaintiff has failed to show that the defendants appropriated any trade secrets in the design of the Metpar machine.

The evidence presented by plaintiff did not show that the defendants utilized any trade secret in which plaintiff had a proprietary interest. Mr. Stine, Calhoon's successor as Plant Manager was the only witness called by plaintiff who attempted to identify the features which are claimed to be trade secrets. Witness Stine asserted that the following features were trade secrets:

(1) The orientation device for the tapered stud.

(2) The pressure at the time of the weld.

(3) Design of the weld jaws.

(4) Feeding of the studs.

(5) The smallness of the welding machine

The primary defect in plaintiff's proof is that the testimony of Mr. Stine who described the alleged trade secrets in broad general terms is not supported by specific evidence showing with particularity what plaintiff claims to be trade secrets. Furthermore, the plaintiff has failed to show that any of the features of defendants' machine which plaintiff claims are improvements were designed and developed by defendants during the time of their employment by plaintiff. There is also a lack of proof that the features such as the orientation device are truly secret and not in the public domain.

With respect to the orientation device for the feeding of the tapered studs the evidence shows that the orientation device utilizes a "dish-out" principle under which the studs are moved by vibration upon an inclined track in a feeder bowl, where the tapered studs pass over a "dish-out", a place where enough of the track is cut away so that a stud presented narrow end first, rather than broad end first, will be discarded. *Defendant King built this orientation device for plaintiff using the "dish-out" principle he observed in operation at Western Electric while he was employed at Sylvania.* Furthermore, feeder bowls using the dish-out principle for discriminating between parts which are larger on one end than the other are known and used in the industry and are not unique. The orientation device is in the public domain and is not proprietary or secret to plaintiff.

Plaintiff has not presented specific evidence showing in what manner and to what extent the pressure at the time of the weld is a trade secret. Expert testimony shows that the pressure is applied in accordance with a scientific formula and phase diagrams which are generally available in the industry. Plaintiff has failed to prove that it owns any identifiable trade secret with respect to pressure at the time of the weld.

Except for Mr. Stines general assertion that the design of the weld jaws is a trade secret, plaintiff did not offer evidence describing the jaw design which it claimed was proprietary to plaintiff. Furthermore, the weld jaws used by defendants are different from the weld jaws used by plaintiff. Defendant King

designed defendants' weld jaws after he left his job with plaintiff. Expert testimony reveals that the design of defendants' weld jaws is not unique.

Plaintiff did not present specific evidence identifying what was included under its broad assertion that the feeding system for the studs was proprietary to plaintiff. Defendants' feeding system differs from the system used by plaintiff and Sylvania in the manner in which the wire is taken from the spool and straightened. The weld arm used by defendants which operates under a well known principal similar to an automobile steering system also differs from the weld arm used by plaintiff. In addition, the plaintiff and Sylvania use electric drive to operate their system while the defendants utilize an air drive which they purchased on the open market. The record is devoid of evidence that these different features were designed by defendants at plaintiff's expense while the defendants were employed by plaintiff. The plaintiff has failed to establish that it has a proprietary interest in the feeding system used in defendants' weld machine.

Mr. Stine asserted that the small size of the weld machine is a trade secret belonging to plaintiff because plaintiff had a reference to a small weld machine in its files. However, the evidence does not show that plaintiff ever designed or developed a small weld machine. Furthermore, the concept of a small weld machine is not unique and is in the public domain. The March 1955 issue of the Welding Journal contains an article about percussive welding in which a small weld machine, similar to the machine built by defendants was illustrated.

The evidence shows that defendant King discussed with the officials of plaintiff the concept of a single purpose small weld machine which had the advantages of taking less time to build and being cheaper to operate. Plaintiff informed King that it did not desire to pursue this idea.

The concept of a small weld machine which would take less time to build was in the public domain. Upon termination of their employment the defendants were free to develop and expand this general concept by designing and building the Metpar weld machine.

The Court concludes that the individual defendants did not receive the knowledge necessary to design the Metpar machine as a result of their employment with plaintiff. Furthermore, the defendants who were highly skilled with regard to stud lead welding machines proceeded independently of any knowledge obtained from plaintiff to design the Metpar machine. Upon termination of their employment, the defendants utilized their general knowledge and experience which is personal and proprietary to them and which the defendants had every right to use in the design of the Metpar weld machine.

The defendants rely upon the case of B. F. Goodrich Company v. Wohlgemuth, supra in which the Ohio Court of Appeals enjoined a former employee of Goodrich from revealing trade secrets to a competitor of Goodrich. The Goodrich case is distinguishable on its facts from the present case. In Goodrich the plaintiff was the forerunner in the field of pressurized space suits and the defendant since his graduation from college had been employed by plaintiff in this field. The Court found that the defendant had learned trade secrets as a result of his employment with plaintiff and enjoined him from revealing those trade secrets to a competing company which had entered the field 14 years after Goodrich began. In the present case the plaintiff has not shown that the defendants learned trade secrets or developed the features of the Metpar machine while they were employed by plaintiff. Furthermore, the defendants in the present case had years of experience in the field and did not acquire their knowledge as a result of their employment with plaintiff.

The plaintiff which hired defendants because of their general skill and experi-

ence with regard to stud lead welding is not entitled to an injunction restraining defendants from utilizing their knowledge and experience in a competing business.

In a case like the present case where the employer employed a person for his general skill and then alleges such knowledge was trade secrets when the person joined a competitor, the employer was denied relief. Tempo Instrument, Inc. v. Logitek, Inc., 229 F.Supp. 1 (E.D.N.Y.1964). In the Tempo Instrument case, supra the Court stated at pages 3-4:

> "* * * The defendant Fischer, like many engineers, has been employed by numerous electronic firms. It appears that several of these positions involved work upon transistor circuits and that his duties at each of these companies provided him with knowledge which made his services desirable to the plaintiff. The plaintiff, having drawn upon Fischer's prior experiences, can hardly now complain that he has added his Tempo 'experiences to the sum total of his knowledge and is utilizing this knowledge at Logitek. Fischer's experience, his skill, his unmatured thoughts and designs were his own. That they had been gained at the expense of the plaintiff certainly gave the latter no legal right to them.' [Emphasis added]"

The plaintiff has presented evidence showing that the defendants terminated their employment without notice to plaintiff. The Court does not condone the manner and form in which the defendants left the employment of the plaintiff but this conduct is not relevant to the question of whether the defendants appropriated trade secrets belonging to plaintiff.

Plaintiff also seeks injunctive relief on the ground that the defendants breached their employment contracts. In substance the employment contracts provided that the defendants would disclose and assign to plaintiff all ideas,

improvements and inventions relating to plaintiff's business during their employment. Calhoon's agreement contained an additional provision requiring the disclosure and assignment of all ideas and improvements during a period of five years afer termination of his employment.

Plaintiff asserts that under the provisions of the contract the improvements in the Metpar machine are the property of plaintiff, regardless of whether or not they constitute trade secrets. The defendants urge that this construction is overly broad and assert that the terms "ideas" and "improvements" only embrace trade secrets. In addition defendants assert that the five year provision of Calhoon's contract is void against public policy.

The terms "ideas" and "improvements" as used in the employment agreement are broad and ambiguous. The Court is of the opinion that these terms were intended to embrace trade secrets only. The construction urged by plaintiff would unreasonably restrict the rights of defendants to utilize their general knowledge and skill upon termination of their employment. Furthermore, the evidence does not show that the improvements in the Metpar machine were conceived and developed by defendants while they were employed by plaintiff or that the improvements were trade secrets.

In the case of Conmar Products Corporation v. Tibony, 63 F.Supp. 372 (E.D.N.Y.1945) the Court held that a similar agreement only prohibited a former employee from disclosing trade secrets and did not prohibit the use of general knowledge and skill. The Court in Conmar Products Corporation v. Tibony, supra, stated at page 376:

> "* * * That which defendant learned and practiced in the plaintiff's employ, necessarily entered into his make up and caused him to be a more skillful and adept person in his calling, then theretofore he had been. He was free to leave his employment and

*necessarily to take with him whatever new or greater skills he had acquired as a designer or builder of machines.* What he was not free to do, unless his contract is to be treated as a nullity, was to give aid and comfort to the plaintiff's competitors by betraying to them, under any guise, the trade secrets which were not his to sell, * * *." [Emphasis added]

■ With respect to the question of whether the provision of defendant Calhoon's contract requiring him to disclose and assign all ideas and improvements for a period of five years after termination of his employment is void against public policy, three principals of law must be considered: 1) Is the restraint reasonable in the sense that it is no greater than necessary to protect the employer in some legitimate interest? 2) Is the restraint reasonable in the sense that it is not unduly harsh and oppressive on the employee? 3) Is the restraint reasonable in the sense that it is not injurious to the public? Briggs v. Butler, 140 Ohio State 499, 45 N.E.2d 757 (1942).

The plaintiff hired defendant Calhoon in order to obtain his expertise, skill and experience acquired at Sylvania so that plaintiff could copy the Sylvania weld machines. When plaintiff hired Calhoon, it did not regard Calhoon's knowledge and experience as being a trade secret. Defendant Calhoon together with the other individual defendants accomplished plaintiff's purpose by renovating the Hadley Plant machines to meet Sylvania capabilities. Under these circumstances plaintiff did not have a legitimate interest in preventing Calhoon from utilizing his general skill and knowledge in a competing business. Furthermore, preventing defendant Calhoon, whose lifetime experience is in the field of stud lead welding machines, from utilizing his knowledge and skill in this field, would unreasonably restrict his ability to earn a living. This is especially true, as in the present case, when the employee was hired from a

competitor so that the employer could receive the advantage of his knowledge and experience acquired from a competitor.

■ Public policy protects any individual against being restrained by contract or otherwise from earning a living based upon his personal skill, knowledge and experience. Moreover public policy encourages an individual to improve his socio-economic status based upon personal skill.

Competition is therefore increased and the business interests is benefited. See Conmar Products Corporation v. Tibony supra. This important public policy would be frustrated if defendant Calhoon is prevented from utilizing his general knowledge and skill in a competing business.

■ The provision of the contract requiring defendant Calhoon to disclose and assign to plaintiff any ideas or improvements conceived by him for five years after termination of his employment with plaintiff unreasonably restricts Calhoon's right to utilize his general skill and knowledge in subsequent employment and is void against public policy.

In addition, the provisions of defendant Calhoon's agreement have no application to the improvements in the Metpar machine because the machine was designed by defendant King and not by defendant Calhoon.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction by reason of the fact that there is diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds $10,000.00 exclusive of interest and costs. 28 U.S.C. § 1332.

■ 2. Plaintiff has the burden of proving by a preponderance of the evidence the following essential elements of its case: A) Plaintiff owns trade se-

crets or proprietary information; B) Defendants are using or threatening to use trade secrets belonging to plaintiff; C) Defendants are breaching or threatening to breach enforceable provisions of their employment contracts with plaintiff; D) Plaintiff has suffered or was threatened with irreparable injury by defendant's actionable conduct.

3. Plaintiff has failed to prove by the preponderance of the evidence: A) that the plaintiff owns trade secrets or proprietary information; B) that defendants are using or threatening to use trade secrets belonging to plaintiff; C) that defendant Davis or defendant King has breached or is threatening to breach his employment contract with plaintiff; D) that defendant Calhoon has breached or is threatening to breach his employment contract with plaintiff relating to the period of his employment by plaintiff; E) that the plaintiff has sustained injury as a result of the defendants' unlawful conduct.

4. The portion of plaintiff's contract with defendant Calhoon requiring Calhoon to assign and disclose to plaintiff ideas conceived during five years subsequent to the termination of his employment with the plaintiff unreasonably restricts Calhoon's right to utilize his general knowledge and skill in a competing business and is unenforceable as contrary to public policy; and in any event would not apply to the machines of defendant Metpar, which were designed by defendant King and not by defendant Calhoon.

5. The plaintiff is not entitled to an injunction.

6. At plaintiff's request, its claim for accounting and damages was reserved pending a determination of its action for an injunction. Since the issue on the injunction is resolved against plaintiff and for defendants, the issue as to accounting and damages is no longer reserved and is resolved against plaintiff.