THE B. F. GOODRICH CO., APPELLANT, *v.* WOHLGEMUTH, APPELLEE.

(No. 5345—Decided May 22, 1963.)

494

*Mr. John D. Wortman, Mr. R. G. Jeter, Mr. W. C. Becker* and *Mr. H. S. Meyer,* for appellant.

*Messrs. Buckingham, Doolittle & Burroughs,* for appellee.

DOYLE, J.  This is an appeal taken from a judgment of the Court of Common Pleas of Summit County by The B. F. Goodrich Company for trial *de novo* here.  We entertain the action on the pleadings and the evidence before the lower court.

The B. F. Goodrich Company, appellant, seeks a permanent injunction against Donald W. Wohlgemuth, a former employee, from doing any of the following things:

"a. * * * performing any work for any corporation, business employer or party other than plaintiff, relating to the design, manufacture and/or sale of high-altitude pressure suits, space suits and/or similar protective garments, hereinafter called 'products,' and

"b. Disclosing to any person or party other than authorized employees of plaintiff [Goodrich], any information or data relating to the design, manufacture and/or sale of such products, and

"c. Consulting or conferring with any person or party other than authorized employees of plaintiff with reference to trade secrets, experimental research or development work of plaintiff, secret processes, techniques, data and information used or developed by plaintiff, future plans of plaintiff, data concerning materials used or rejected by plaintiff, sources of supply for materials insofar as the foregoing pertain to the design, development, manufacture and/or sale of such products, and

"d. Contacting, either directly or indirectly, any present or future employee of plaintiff engaged or experienced in the design, development, manufacture and/or sale of such products for the purpose of obtaining information from him or her related to the design, development, manufacture and/or sale of such products, or endeavoring, either directly or indirectly, attempting to induce or encourage any of plaintiff's said employees to leave the employment of plaintiff."

It appears from the record that Donald W. Wohlgemuth graduated from the University of Michigan in the year of 1954 as a bachelor of science in chemistry; soon thereafter be ob-

tained employment with The B. F. Goodrich Company; following a short period of service in the United States Army, he returned to the Goodrich Company in the year 1956, and was assigned to work in the pressure-space suit department; as his technical knowledge increased, he was appointed successively in this highly specialized department to the positions of materials engineer, product engineer, sales engineer, technical manager, and finally manager of the department.

In November, 1962, Wohlgemuth was offered a position of employment by the International Latex Corporation, of Dover, Delaware, which corporation operates in the pressure-space equipment field, and is a competitor in this field of operation with The B. F. Goodrich Company; the offer of employment by Latex to Wohlgemuth resulted in his resignation from Goodrich and his employment soon thereafter by Latex.

The B. F. Goodrich Company, as the record shows, has been in the high-altitude, full-pressure space suit business since the year 1934, and over the years it has acquired, through experiment and development of processes, a high degree of scientific knowledge and advanced technology required in the research, design, construction, and testing, of space suits. It may be concluded from the evidence, as stated by appellant, that ''Each phase of this business must be meticulously accomplished, because a failure of a minute part of the finished product would probably result in the loss of the life of the user. In the production of the final product—a suit to protect man in space—there are involved countless secrets which one must either create or acquire from someone who has already done so.''

The International Latex Corporation (present employer of the litigant, Wohlgemuth), is a manufacturing company with about 6,000 employees, which first entered the pressure-space equipment field in the year 1948, or approximately fourteen years after the entry of Goodrich. It first developed a pressure breathing mask, and later a full-pressure helmet. In the spring of the year 1962, the National Aeronautics and Space Administration awarded a contract known as the Apollo (man-on-the-moon contract), for the development of a space vehicle. (Project Apollo, in general terms, is ''the first space project of the United States aimed at putting a man on the surface of the moon and bringing him back.'') This contract was awarded to Hamilton

Standard Division of the United Aircraft Corporation, with International Latex Corporation as subcontractor to develop the space suit.

There is no doubt that Wohlgemuth was one of a few top executives and developers in this field of operation with the Goodrich Company, and that he had, and has, full knowledge of many of the secrets and confidential facts which have come into existence through not only his own work, but also that of his fellow scientists and engineers with whom he has been closely associated. In fact, he stated that he was (1) technically responsible "for complete engineering of pressure suits and ancillary equipment, both the development and production phases"; (2) "responsible for the co-ordination between development engineering and The B. F. Goodrich's research center's efforts in pressure suit research design and development"; (3) responsible for keeping himself and subordinates abreast of the latest advancements and "state of the art in the space suit field"; (4) responsible for the direction of proposal writing aimed toward further space suit development.

It further appears that Wohlgemuth, while employed by Goodrich, was in technical charge of practically all research in space suits, and as a result had detailed knowledge of the scientific and engineering principles involved in the production of space suits for use in space flight. The evidence also shows that he was required, in the course of his employment with Goodrich, to "co-ordinate the activities of the research center and the development engineering group in the space suit field"; "approve or veto new designs and direct changes in designs"; "approve or direct changes to new manufacturing specifications and revisions, standard operating procedures, suggestions and new simplifications"; "review and direct technical action on customer specifications, requests to quote, purchase order inquiries, contracts and contract modifications"; "direct compounding operations on pressure-suit items"; "check out new materials and designs"; and, "check out changes in product engineering policies."

Directing attention again to the pleadings of Goodrich, we find the following assertions upon which it bases its claim for injunctive relief:

"13. Plaintiff [Goodrich] has been informed and believes

that defendant [Wohlgemuth] has been employed by International in the capacity of Technical Director, with the duties of managing International's space suit business and with the specific duty of designing and developing high-altitude pressure and space suits in competition with plaintiff [Goodrich], and unless restrained * * * will disclose, use, discuss and make available to International and other parties the trade secrets, information and data referred to above belonging to plaintiff, in violation of defendant's legal and contractual obligation.

"14. The plaintiff has no adequate remedy at law for the relief herein sought and it will suffer irreparable injury unless the relief herein sought is granted, since the dissemination and use of the confidential and secret information referred to above will make it impossible to preserve its rights in and to such confidential and secret information."

Throughout the voluminous record of testimony can be found evidence establishing Goodrich trade secrets used in the manufacture of space suits presently in use, and trade secrets resulting from research and process development for use in the later manufacture of equipment, to make possible the continuance of human life in future space travel, as for instance in the present Apollo project.

Evidence further establishes the fact that Goodrich's former employee, Wohlgemuth, is in possession of many of these secrets; in fact, he was a part of the various Goodrich teams of highly-skilled men, which, through research and development, brought them into existence. The evidence further establishes the conclusions of fact of the Court of Common Pleas (which court, nevertheless, denied the injunction) that:

"There isn't any doubt that the Latex Company [in hiring Wohlgemuth] was attempting to gain his valuable experience in this particular specialized field for the reason that they had this so-called 'Apollo' contract with the government, and there isn't any doubt that if he is permitted to work in the space suit division of the Latex Company he could not only give the Latex Company valuable experience and skill in this specialized field, which he has a right to do, but he would have an opportunity to disclose confidential information of The B. F. Goodrich Company."

There is testimony in the record indicating the mental atti-

tude of Wohlgemuth at the time of the severance of his Goodrich employment. When objection was made, by a member of the Goodrich staff, to his accepting employment with a competitor in the highly-specialized field of space equipment, he said that "he would like to state his side" of the case.

He explained that he had been contacted "by an employment agency regarding this new job," and that he subsequently visited International Latex, where he was then offered an "increase in salary and a better position." It was then said to Wohlgemuth that in leaving Goodrich "he was taking with him a body of information which did not belong to him or to any individual, but did belong to the company, and that there was a matter of company loyalty and ethics involved." Wohlgemuth replied that "loyalty and ethics had their price; insofar as he was concerned, International Latex was paying the price."

In further conversation, Wohlgemuth said that Latex knew of him because of his pressure-suit work, and when he was asked if he felt that he "could go into this position with a competitor and not use information which was proprietary to Goodrich," he replied that: "Once he was a member of the Latex team, he would expect to use all of the knowledge that he had to their benefit."

The appellee, Wohlgemuth, defends this action in part with the claim that Goodrich has not shown, by the evidence, a "clear right" to an injunction, in that "Goodrich's proof does not sustain its claim of trade secrets."

No attempt will be made to define trade secrets, but we refer to the many cases cited in 42 Words and Phrases, 295, in which definitions appear. We adopt, for the purposes of this case, the elements of trade secrets as they are set forth in 4 Restatement of the Law of Torts, 5, Section 757 b:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as,

for example, a machine or formula for the production of an article. * * *''

See also: 52 Ohio Jurisprudence (2d), 417, Trade Secrets, Sections 1 to 4, and Ohio cases cited therein.

We have no doubt from the testimony of many witnesses, and the exhibits, that Goodrich possessed a number of trade secrets in the space-suit area which resulted from a multitude of experiments and expensive research, and that it had put into practice close security measures for maintaining the secrecy of many of the processes and scientific knowledge employed in space-suit manufacture and its future development.

The subject matter of a trade secret must be secret, and matters of public knowledge or of general knowledge in an industry cannot be classified as trade secrets; however, the fact that a number of engineers, scientists and technicians employed by a corporation for research and development in an area pertinent to the manufacture of an article, such as a space suit, are possessed of knowledge of the secret processes and devices discovered and created by their joint or individual efforts, does not make their knowledge general or public knowledge; and the processes and devices, if they are in fact trade secrets, remain trade secrets of their employer.

We find from the evidence that Wohlgemuth is possessed of knowledge of Goodrich trade secrets, and that any revelation of them to a Goodrich competitor is in equity a breach of faith and reprehensible to a court of equity.

There is no evidence before this court that Goodrich trade secrets have been revealed by Wohlgemuth; however, the circumstances surrounding his employment by Latex, and his own attitude as revealed by statements to fellow Goodrich employees, are sufficient to satisfy this court that a substantial threat of disclosure exists. We have no doubt that an injunction may issue in a court of equity to prevent a future wrong although no right has yet been violated.

In cases of this character the law does not require an agreement between an employer and employee restricting the employee from securing employment with a competitor before an injunction may issue.

It is a rule in equity jurisprudence that, if an employee gains knowledge of his employer's trade secrets as a result of

the confidential relationship existing between employer and employee, and, in violation of the confidence, discloses such secrets to competitors after the termination of his employment, such abuse of confidence may be enjoined. The basis for equitable intervention is the employee's wrongful conduct in violating the confidence. Equitable intervention is sanctioned when it appears, as it does in the instant case, that there exists a present real threat of disclosure, even without actual disclosure.

While we could base the decision in this case upon the general rules of equity stated above, there is an additional ground for injunctive relief. When Wohlgemuth re-entered his employment with Goodrich, following his army service, he entered into a contract with his employer in which he promised ''6. To keep confidential all information, records and documents of the Company of which I may have knowledge because of my employment with the Company, and, except as required by my employment, not to remove from the property of the Company any record or other document relating to any business of the Company, or make copies thereof; all such records and documents whether made by me or by others being recognized as the property of the Company and not to be used for my own or another's benefit or communicated to another, either before or after termination of my employment with the Company, without the written consent of the Company.''

This written contract expressly binds the employee not to breach the trust and duty accepted by him—that is, not to misuse special confidential knowledge of trade secrets secured by him while the contractual relationship of employment existed. Injunction may be employed to prevent such abuse.

We have no doubt that Wohlgemuth had the right to take employment in a competitive business, and to use his knowledge (other than trade secrets) and experience, for the benefit of his new employer, but a public policy demands commercial morality, and courts of equity are empowered to enforce it by enjoining an improper disclosure of trade secrets known to Wohlgemuth by virtue of his employment. Under the American doctrine of free enterprise, Goodrich is entitled to this protection.

In conclusion, we find by clear and convincing evidence that Goodrich's former employee is possessed of Goodrich's trade

secrets made known to him by virtue of his employment with Goodrich; that a disclosure of trade secrets to a competitive company is seriously threatened; and that, unless a restraining order is issued, Goodrich may suffer irreparable injury. As a consequence of this finding, we direct the issuance of an injunction not inconsistent with this opinion.

*Injunction granted.*

HUNSICKER, P. J., and STEVENS, J., concur.