**PENETONE CORPORATION, Plaintiff,**

v.

**PALCHEM, INC., et al., Defendant.**

**No. C85–3373A.**

United States District Court,
N.D. Ohio, E.D.

Nov. 27, 1985.

Robert V. Vickers, Body, Vickers & Daniels, Cleveland, Ohio, Paul Fields, Terry Sue Zisowitz, McAulay, Fields, Fisher, Goldstein & Nissen, New York City, for Penetone Corp.

A.P. Leary, Chagrin Falls, Ohio, for Scott & Fetzer Co. d/b/s Scot Laboratories.

Wayne H. Calabrese, Guy, Lammert & Towne, Akron, Ohio, for Palchem, Inc. and Carl J. Paolucci.

DOWD, District Judge.

Plaintiff, the Penetone Corporation (hereinafter "Penetone"), filed its complaint against the defendants, Palchem, Inc. (hereinafter "Palchem"), Carl J. Paolucci, and the Scott & Fetzer Company, d/b/a Scot Laboratories (hereinafter "Scot") on November 12, 1985, setting forth nine causes of action. In its complaint, plaintiff alleges, *inter alia*: (1) that the defendant Paolucci and "his essentially alter ego," Palchem, have violated a noncompete clause in an employment agreement between defendant Paolucci and the plaintiff; (2) that the defendant Paolucci revealed trade secrets to the defendant Scott & Fet-

zer Company; (3) that the defendants willfully and intentionally infringed upon plaintiff's registered trademark in violation of 15 U.S.C. §§ 1114 and 1125(a); (4) that the defendants are guilty of common law trademark, service mark, and trade name infringement, as well as unfair competition; (5) that the defendants are guilty of converting plaintiff's property; and, finally, (6) that the defendant Paolucci has abused the confidential relationship he enjoyed with his former employer, the plaintiff.

Before the Court is the plaintiff's motion for a preliminary injunction. In his motion, plaintiff requests that the Court:

(a) enjoin the defendants from contacting plaintiff's customers and diverting sales in breach of an employee agreement not to compete for one year following termination of employment;

(b) enjoin defendants from converting plaintiff's storage tanks located on customers' premises and filling said storage tanks with defendants' goods;

(c) enjoin defendants from disclosing plaintiff's trade secrets to third parties;

(d) using plaintiff's trade secrets to manufacture and market defendants' products; and

(e) enjoin defendants from infringing plaintiff's common-law and registered trademarks and otherwise unfairly competing with plaintiff.

Plaintiff's motion for preliminary injunction, pp. 1–2.[1] For the reasons which follow, the motion for preliminary injunction is granted.

## EVIDENTIARY SUBMISSIONS

An evidentiary hearing was held in the above-captioned matter on November 19, 1985. At the hearing, counsel for the plaintiff introduced the deposition testimony of the defendant, Carl J. Paolucci, Paul Distad, Vice-President of operations for the Scott & Fetzer Company, Scot Lab Divi-

---

1. On November 14, 1985, this Court issued a temporary restraining order in which it restrained the defendants from engaging in much of the conduct which plaintiff now seeks to enjoin. The Court extended that order to No-

vember 25, 1985 per order of November 21, 1985. On November 25, 1985, the Court extended the temporary restraining order until the filing of the Court's opinion on the plaintiff's motion for a preliminary injunction.

sion, and Frank Lombardi, Sales Manager at Scot Laboratories. At the hearing, counsel for the plaintiff made numerous references to these depositions, as follows.

Defendant Carl Paolucci testified upon deposition that he was employed by Penetone on August 29, 1977, *see* deposition of Paolucci, p. 26, to sell Penetone products (chemical cleaners). Defendant further testified as follows. Defendant learned about plaintiff's products by reading the "Tech Data Sheets," the sales sheets that the plaintiff company distributes to its customers. *See id.* at 27. Defendant was initially assigned to what has been designated as Territory 807, which at that time primarily encompassed Jones & Laughlin Steel. *See id.* at 28. In 1979, defendant became more specialized in the steel industry, and in March of 1985, was "almost totally specialized," and was "told [by his regional manager] to work nothing but steel accounts." *Id.* at 29.

Defendant testified that in working as a salesman for the plaintiff company, he spent about 90% of his time at LTV Steel. Prior to October of 1984, when Republic Steel merged with Jones & Laughlin, defendant referred to Republic Steel as LTV Steel East and Jones & Laughlin as LTV Steel West. *See id.* at 42. Those two plants, including the Warren plant, were where defendant spent approximately 90% of his time. *See id.* at 43.

Defendant was given instructions on Penetone's products at various sales seminars. *See id.* at 35. Sales seminars were given at least twice a year. "Solvent seminars" were also given to instruct people in the proper use of solvents by the then steel manager of the Penetone Corporation. *See id.* at 36.

Defendant testified that it is usually general foremen who are responsible for the ordering of the goods he sold. He explained the procedure that he follows to introduce a new product at LTV as follows. *See id.* at 44. He tries to determine the need for a product and then introduces a sample product which he demonstrates himself, if he is able, to a foreman. *See id.*

at 44–55. Before a foreman can order any products, the Material Safety Data Sheets on the product must be approved by corporate safety. *See id.* at 45. Once a product is approved, defendant then approaches the purchasing department to ask them if they will put the product on a blanket purchase order. *See id.* at 48. So, in summary, if a foreman approves a product for use in the plant, he then contacts corporate safety with the Material Safety Data Sheets on the product, as well as the district safety office. The district safety office then sends a copy of the Material Safety Data Sheets to the general foreman, who in turn writes up a job safety analysis of the product. *See id.* at 49.

In August of 1985, a blanket purchase order was first issued to the defendant Palchem. *See id.* at 67. Defendant executed the articles for incorporation for Palchem on August 2, 1985. *See id.* at 78. Defendant formed the corporation "[s]trictly as a protective measure." *See id.* at 79. He explained his answer by stating that "Penetone was cutting [his] commissions drastically and [he] saw the handwriting on the wall what they were going to do next. [He] saw what happened to other people." *Id.* He testified that:

> Penetone had fired 50 percent of the sales force within six weeks. They had also harassed many people and they had cut compensation drastically in October of '84 and in the spring of '85 and took a third very drastic cut in August of '85. And when they did that I was prepared, because I saw it coming.

*Id.* He testified that he "was prepared to do what other Penetone salesmen have done in the past year, to bail out of the corporation because it was going down the tubes." *See id.* at 79–80. Defendant intended for Palchem to enter into the chemical business with eleven products which were in competition with the highest selling Penetone products in the defendant's selling area. *See id.* at 80–81.

Defendant is president of Palchem, and his wife, Kaylyn Ann Paolucci, is vice-president and treasurer. Defendant and his

wife are the only two corporate officers. There are no corporate directors, and no stocks or shares in the corporation have been issued yet. *See id.* at 81. Defendant and his wife are the only employees of the corporation. Defendant sells Palchem products and his wife answers the telephone and does the billing work. *See id.* at 82.

Defendant first formed the idea of selling products in competition with Penetone in April of 1985, *see id.* at 82, which was when he first contacted Scot Laboratories about producing products to compete with Penetone. *See id.* at 83. Defendant spoke with Fred Lombardi at Scot Laboratories, and told him that:

[defendant] was being crucified by the Penetone Corporation and that I thought I should have a back door in case the company either went bankrupt or the fact that I was going to lose commission monies to the point where I was going to have to either go to work for another company or for my own company.

*See id.*

At defendant's first meeting with Lombardi, defendant discussed with Lombardi the possibility of Scot producing products similar to Penetone's products to meet the needs of LTV Steel. The two men discussed availability and transportation based upon defendant's knowledge of the requirements of LTV Steel. *See id.* at 84. Defendant supplied Lombardi with a sample of materials for eleven products produced by Penetone. *See id.* at 85. The only products that Palchem is currently selling and offering for sale are the Palchem version of those same eleven Penetone products. *See id.* at 86.

Defendant testified that although he first met with Lombardi in April of 1985, it was not until May that he actually gave him samples of the eleven Penetone products. *See id.* at 86–87. Defendant testified that he probably spoke with Lombardi by phone in between those two meetings. *See id.* at 87. When defendant spoke with Lombardi, defendant was the one who actually offered the samples, which he had orig-inally obtained from Penetone's Akron warehouse. *See id.* at 87–88. Penetone owned the material. When defendant turned over the material to Lombardi, Paul Distad, operating manager of Scot Laboratories was present. Both men knew the defendant was then an employee of the plaintiff Penetone. *See id.* at 88. He further informed the men that he was giving them Penetone's samples.

Defendant additionally gave Scot Laboratories Material Safety Data Sheets to assist them in analyzing the products. *See id.* at 90. Defendant Scot's chemist requested the Material Safety Data Sheets in June of 1985, *see id.* at 91, and Paolucci supplied them shortly thereafter. Scot Laboratories, however, had analyzed some of the products with which defendant had supplied them prior to receiving the material safety data sheets. *See id.* at 92.

Defendant was given samples of the new products in July of 1985. Defendant informed Lombardi, Distad, and the chemist for Scot that he was going to attempt to market the products Scot Laboratories had produced to LTV. He testified that he selected the names of the products that Palchem was going to market. *See id.* at 94. He testified that he did not demon-strate the samples of the products that Scot Laboratories had produced to anyone at LTV until September of 1985. Defendant testified that prior to September 30, 1985, he discussed selling the products pro-duced by Scot Laboratories to Barbara Wilmore, a purchasing agent for LTV. He testified that Wilmore was responsive to his overtures, as LTV had had many prod-uct complaints and product delivery prob-lems (apparently from Penetone). *See id.* at 96.

Defendant told Wilmore that he was in-terested in selling his products in competi-tion with Penetone. Defendant submitted the Material Safety Data Sheets from Scot Laboratories on the products he was inter-ested in selling to LTV's corporate safety department. Defendant did not submit any products produced by Scot Laboratories to LTV. He testified that the Material Safety

Data Sheets filled out by Scot were the property of LTV Steel. *See id.* at 98. Defendant obtained the blank data sheets from records that he kept in his home files, *see id.* at 100, which he submitted to Scot Laboratories to fill in, and thereafter submitted to LTV Steel for approval. *See id.* at 101. Defendant finally got approval for his products from LTV's corporate safety department around the first or second week of September. Defendant received the approval of corporate safety before September 15, 1985. *See id.* at 104. Barbara Wilmore issued a blanket purchase order from LTV to Palchem. *See id.* at 106.

When questioned about the pricing of his products, defendant testified that in arriving at the pricing for his various products which he offered for sale to LTV, he took into account the cost of manufacturing the product, the cost of delivery, and the profit margin that could be made on the product. *See id.* at 109.

Defendant first demonstrated two products (PC–42 and PC–80) to LTV somewhere between the 15th and 25th of September. *See id.* at 110. Defendant subsequently began soliciting orders from LTV for the Palchem products "[s]omewhere right after the 15th of September." *See id.* at 111. Defendant received his first order from LTV for Palchem products somewhere around the 20th or 23rd of September. *See id.* at 112.

Defendant testified that Scot is advancing him a credit line for producing Palchem products, which he negotiated with Lombardi and Distad. *See id.* at 113. Once defendant receives an order from LTV he communicates the order to Scot Laboratories, *see id.* at 114, which arranges for the shipment of the products. Defendant does sell materials in bulk to LTV, which are stored, in some cases, in tanks LTV used to store Penetone products. Defendant testified that some of the tanks are owned by LTV and some are owned by Penetone. *See id.* at 115. Defendant testified that LTV's general foreman of the tanks area

has given him permission to use them. *See id.* at 118.

In 1984, defendant's net sales for Penetone totaled about $830,000.00. *See id.* at 59. In 1985, through September 30, defendant's net sales were about $841,000.00. *See id.* at 60.

The Material Safety Data Sheets referred to by the parties at the deposition of the defendant were introduced as exhibits in the deposition of Paul Distad. *See* exhibit PD–6. The Court has reviewed those data sheets, as well as the transcripts and other exhibits to the depositions of Paul Distad and Frank Lombardi, but finds the above related testimony of the defendant Paolucci to necessarily be the primary focus of the Court.

The plaintiff further introduced the testimony of Robert T. Steen, President and Chief Executive Officer of the plaintiff Penetone for the past fourteen months. At the hearing, Steen testified that Penetone's policy regarding samples is that they are not to leave the premises since they may come in contact with people who do not know how to use them and may cause eye or skin damage. He testified that this policy is communicated to sales people at regional and national sales meetings, and at other corporate meetings. He conceded that it is impossible to keep the product from being copied, and stated that he realized that the policy would "probably [be] unsuccessful at stopping something like that."

Steen testified that Penetone viewed the Material Safety Data Sheets sent to the environmental and safety departments of its prospective customers in a proprietary manner. He testified that it is only by exception that those sheets are sent to sales engineers, since the "right to know laws" require the listing of essential data and product information on those sheets, and the company does not want to disclose that data. He stated that the product mix of the various products is also viewed in a proprietary manner by the plaintiff Penetone, and that Penetone has a policy of maintaining secrecy as to the product mix

by letting few people know of it. He further stated that Penetone viewed its negotiated pricing arrangements in a proprietary manner, and also maintained a secrecy policy toward them.

Steen also testified that Penetone paid for the liquid storage bins on LTV's property. He testified that LTV was never charged for the bins, and that they were carried on Penetone's books as capital expenditures.

Steen testified that sales to LTV have substantially decreased in the last two months.

At trial the defendants called as a witness Carl John Vincent Paolucci, as well as Paul Distad and Barbara Wilmore. Defendant testified that he worked for the plaintiff Penetone from August 29, 1977 to September 27, 1985.

Defendant testified that he was happy working at the plaintiff company until September or October of 1984, when various changes took place in the company. At that time there were 63 people on Penetone's national sales force. In less than a two month period, 30 people were removed from the sales force. Defendant called the effect "catastrophic," and testified that he felt his job was jeopardized. In April of 1985, defendant started looking at the possibility of marketing his own products if the plaintiff went out of business, and approached the defendant Scot to see if it could manufacture products Paolucci was then selling for the plaintiff.

Defendant's testimony at the hearing substantially coincides with his testimony at his deposition. Defendant attended seminars at which he learned of Penetone's new products and received written selling materials which he was instructed not to disclose. Defendant was not instructed not to disclose what he had been orally told. Defendant was given samples of Penetone's products in metal pint containers to use to do demonstrations and to give as gifts to his customers. Defendant did give the samples as gifts to his customers, but did not instruct his customers on what they could or could not do with the samples.

Defendant sometimes gave noncustomers, such as close friends, some of the samples of the Penetone products.

Defendant testified that the Material Safety Data Sheets which he gave to LTV he obtained from the safety department at LTV Steel. He testified that some he had in his own possession. He testified that he did not give those data sheets to friends.

Defendant testified that he had no access to any chemical formulations of the Penetone products. He states that the chemical formulas may have been mentioned by members of the safety department, but he did not take any formulas with him.

Defendant testified that he is aware that Penetone has made sales to LTV since he has left Penetone. He testified that last week (i.e., the week before the hearing), he saw a Penetone truck unload material at LTV. Defendant testified that most of the 500 and 300 gallon liquid storage bins on LTV's facility are marked "Penetone."

On cross examination, defendant testified that the biggest volume product which he sold for Penetone was NV–42 and NV–80.

Upon examination by the Court, the defendant testified that he first received an order from LTV for Palchem products on September 17. Defendant solicited the order that same date. He first started soliciting for Palchem on September 16 on a blanket purchase order for Palchem. Defendant testified that Scot Laboratories told him supplies of the competing products he wished to sell were ready in June. However, defendant testified that he did not take any samples of the product to LTV before September 16.

Defendant Paolucci testified that when he met with Lombardi, defendant supplied Lombardi with one pint samples of the type which he gave to customers to enable Scot Laboratories to reproduce the products he requested, including NV–42 and NV–80, solvent emulsion products. Lombardi told defendant that a number of products he wished to obtain could be obtained from a raw material supplier in the requested

form. Defendant had no knowledge of whether Scot had or was making some of these products before it was approached by Paolucci.

Defendant did not begin testing the products which Scot Laboratories prepared for him until September 15, other than tests which he had done on his own garage floor. Defendant had a blanket purchase order from LTV before any tests were even performed on the products manufactured by Scot.

Defendant testified that some time after September 15, 1985, he demonstrated the Scot products to five general foremen at LTV. Defendant's first order was delivered to LTV on September 23, 1985. The second order was delivered shortly thereafter. Defendant then proceeded to deliver about two to three orders a week. Defendant did not have to pay Scot in advance of their production of the eleven products.

Defendant testified that Palchem has placed approximately $100 to $110,000.00 worth of orders with LTV. Defendant has not received any money in payment from LTV, and has not yet paid Scot. He testified that to his knowledge only one order which has been placed with Palchem from LTV is unfilled.

Defendant testified that he earns a small profit margin on his products. Defendant's gross income last year was approximately $84,000.00. Defendant earned approximately $74 to $75,000.00 of that from LTV on commissions. Defendant earned up to $69,000.00 working for Penetone in 1985 up until the time he left.

The eleven products that Palchem is currently selling correspond with Penetone's highest selling products. Defendant testified that he makes his sales based upon the knowledge and experience he has attained from Penetone.

Defendants also called as a witness Paul Distad, Vice-President of Operations of Scot Laboratories. Distad testified that defendant Paolucci first approached him in April of 1985 because he was unhappy with his situation at the plaintiff company, and

wanted to start his own business. He testified that Paolucci brought him samples of the products he wished Scot Laboratories to manufacture. He testified that he sees hundreds of such samples of competitor products every year, which are brought to him by an existing customer who wants to manufacture a competitor's product. He testified that in reproducing the products, he looks at the product catalog sheets to see what the product is used for and what kind of performance is expected. On cross-examination, the witness testified that Paolucci guaranteed a large volume of sales to entice Scot to test the requested materials.

Defendants additionally called as a witness Barbara V. Wilmore, who is a buyer of production materials for LTV. Wilmore testified that Paolucci approached her in July of 1985, and told her that he was leaving the plaintiff Penetone, and was going into business for himself. She testified that before she would consider giving Paolucci a blanket purchase order for the products which he was going to produce, she told him that she would have to see the facilities at which the products would be produced. She testified that on July 30, 1985, she accompanied Paolucci to Scot Laboratories and was very impressed with the facilities. She told Paolucci that he would have to supply her with the Material Safety Data sheets filled out by Scot on the products he intended to sell. On cross-examination, the witness testified that she would not have released a blanket purchase order to Paolucci if she was not satisfied that Scot Labs could produce the material. She testified that Paolucci knew steel mill problems, such as how to clean "stuff" on the floor. She testified that that was one reason that she was so impressed with him was that he was very steel-oriented.

Regarding the liquid storage tanks on LTV's property, Wilmore testified that a few weeks ago Penetone told LTV they were Penetone's. She testified that she does not know who they belong to, and has no records of ownership on them.

## DISCUSSION AND LAW

[G]ranting a preliminary injunction is the exception rather than the rule.... [I]t is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion ...." *State of Texas v. Seatrain International, S.A.*, 518 F.2d 175, 179 (5th Cir.1975). *See also Cincinnati Bengals, Inc. v. Bergey*, 453 F.Supp. 129 (S.D.Ohio 1974). "[T]he decision about an injunction is one addressed to the discretion of the Court." *Cincinnati Bengals, supra*, at 145.

In *Van Drivers Union Local No. 392 v. Neal Moving & Storage*, 551 F.Supp. 429 (N.D.Ohio 1982), Judge Ann Aldrich of the United States District Court of the Northern District of Ohio recognized the standards for issuing a preliminary injunction in this Circuit, as follows:

> Plaintiff must demonstrate that it has a substantial likelihood of prevailing on the merits; that it will suffer irreparable injury if the relief is not granted; that there will be no substantial harm to others if the relief is granted; and that the public interest will be served by the issuance of the injunction .... Moreover, a balancing of traditional equitable considerations is required, rather than a mechanical application of the four-part test .... When balancing these interests, the primary prerequisites for the issuance of an injunction are: (1) that plaintiff's threatened injury be irreparable; and (2) that public policy will not be offended by the issuance of the injunction.

*Id.* at 431 (citations omitted). *See also Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985); *In Re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985).

Plaintiff seeks a preliminary injunction on numerous grounds. Specifically, plaintiff avers that it is entitled to preliminary injunctive relief under any of the following separate legal doctrines:

1. Plaintiff's Right To Relief Based Upon The Defendants' Breach Of The Covenant Not To Compete
2. Plaintiff's Rights To Relief Under Trade Secret Law
3. Plaintiff's Right To Relief Based On Section 43(a) Of The Trademark Act Of 1946 And Trademark Infringement
4. Plaintiff's Right To Relief Based Upon Defendant Paolucci's Abuse Of a Confidential Relationship
5. Plaintiff's Right To Relief Based Upon The Defendants' Unlawful Interference With Plaintiff's Established Business Relationships
6. Conversion

*See* Plaintiff's motion for a preliminary injunction. For the reasons which follow, the Court finds that the plaintiff is entitled to injunctive relief based upon its claims of defendants' violations of Ohio trade secret law. The Court therefore need not consider the other theories advanced by the plaintiff.

The terms of Ohio Rev.Code § 1333.51(C) provide as follows:

> No person, having obtained possession of an article representing a trade secret or access thereto with the owner's consent, shall convert such article to his own use or that of another person, or thereafter without the owner's consent make or cause to be made a copy of such article, or exhibit such article to another.

The words "trade secret" are defined in Ohio Rev.Code § 1333.51(A)(3), which provides as follows:

> "Trade secret" means the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge. Such scientific or technical information, design, process, procedure, formula, or improvement, or any business

plans, financial information, or listing of names, addresses or telephone numbers is presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes.

Ohio case law has defined a trade secret as "[A]ny formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *See B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493, 498, 192 N.E.2d 99 (9th Dist.1963),[2] *quoted in Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir.1976) and *G T I Corp. v. Calhoon*, 309 F.Supp. 762, 768 (S.D.Ohio 1969). However, "[t]here is no presumption that any particular idea imparted to or acquired by an employee is a trade secret unless the possessor takes active steps to maintain the secrecy." *Water Management, Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85–86, 472 N.E.2d 715 (1984) (citations omitted).

■ The specific factors which should be considered in determining whether something. is a trade secret are as follows:

(1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Pyromatics, Inc. v. Petruziello*, 7 Ohio App.3d 131, 134–135, 454 N.E.2d 588 (8th Dist.1983). *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862,

2873, 81 L.Ed.2d 815 (1984); *Water Management, supra*, 15 Ohio St.3d, at 86, 472 N.E.2d 715. Further,

[I]n any trade secret case involving the alleged wrongful appropriation of trade secrets by former employees the Court must reconcile the conflicting rights of an employer to enjoy the use of secret processes and devices which were developed through his own initiative and investment and the right of employees to earn a livelihood by utilizing their personal skill, knowledge and experience.

*G T I Corp., supra.*

■ A plaintiff attempting to establish a cause of. action for wrongful appropriation of trade secrets must show by a preponderance of the evidence three things. First, a plaintiff must show that a trade secret exists. Second, the plaintiff must establish that the trade secret was acquired as a result of a confidential relationship, and third, as a result of the unauthorized use of the secret. *See G T I Corp. v. Calhoon, supra*, at 767.

As to whether or not a preliminary injunction is the appropriate remedy to prevent the defendants' alleged unauthorized use of the plaintiff's trade secrets, the Court notes the holding of the Court of Appeals in the *Pyromatics* case, *supra*, that "where competition arises solely from the misappropriation of trade secrets, injunction is the proper remedy." *Pyromatics supra*, 7 Ohio App.3d, at 137, 454 N.E.2d 588 (citations omitted).

Applying the above law to the facts of the present case, the necessary inquiry for the Court thus becomes whether the information acquired by the defendant in his role as a salesman for the plaintiff company constituted protectable trade secrets, and whether the plaintiff took substantial steps to keep such information secret. *See Pyromatics, Inc., supra*, at 134, 454 N.E.2d 588.

---

**2.** The Court adopted this definition from the RESTATEMENT OF TORTS § 757 Comment b

(1939).

The information which the plaintiff alleges constituted trade secrets which the defendant Paolucci disclosed to Scot Laboratories includes the Material Safety Data Sheets for plaintiff's products, as well as samples of plaintiff's products. Further, plaintiff argues that the defendant disclosed its chemical formulations, pricing policies (negotiated pricing structure), product mix, customer requirements, and the like, *see* plaintiff's motion, pp. 23, 26, which were also trade secrets.

Applying the factors raised by the Court in the *Pyromatics* case, *supra*, to the evidence before the Court in the case at bar, the Court finds first that the information which the plaintiff labels as trade secrets was not in large part "public" information; *i.e.*, it was known outside the business to a very limited extent. Further, the Court finds that the evidence establishes that the information in question is known to a restricted and guarded few "inside" the business. Additionally, the Court finds that the defendant gained access to the information alleged to be trade secrets through his employer, and that the plaintiff took a number of precautions to safeguard the secrecy of much of the information disseminated by the defendant to Scot Laboratories.

Specifically, Robert Steen testified that the plaintiff regarded product formulas to be of a proprietary nature, and stated that anyone with direct or indirect contact or exposure to the formulas signed a secrecy agreement. He testified that the formulas are kept under lock and key at all times. Likewise, he testified that the company's policy toward the submission of samples to customers was that all samples should be shipped directly to sales engineers or regional managers, should be demonstrated by the plaintiff's representatives, and should not be left behind. Steen testified that this policy was communicated to plaintiff's salespeople at regional, national, and other sales meetings. Steen testified that the Material Safety Data sheets were viewed by Penetone as being absolutely proprietary. Steen testified that the plaintiff took certain steps to maintain the data

sheets as proprietary. He testified that they were to be sent directly to the environmental and safety departments of both customers and prospective customers. From time to time, as an exception to the rule, the data sheets were delivered to sales engineers only when deemed necessary to maintain a customer relationship or prevent impeding the sales process. Steen testified that the reason for this restrictive policy was the right to know law that comes into effect November 25, which requires the plaintiff to list all the ingredients of its products on the Material Safety Data sheets. He testified that the data which the plaintiff is required to provide on the sheets in essence requires the plaintiff to give away the characteristics of the formula of the product. He testified that the company was therefore inclined to do everything in its power to avoid making the data sheets public knowledge. Steen also testified that the product mix which was sold to a customer was viewed to be of a proprietary nature, and added that only a select few people know of it. Lastly, Steen testified that the pricing arrangements which Penetone negotiated with the customer were also viewed as proprietary information and were maintained in that fashion. He testified that only a few people are brought into the "loop," and those people would be key management personnel and the particular sales engineer who was serving a particular count. For example, he stated, no competitor knows what Penetone is charging LTV for the goods Penetone is selling LTV.

The Court finds that the evidence establishes that Penetone did take numerous precautions to guard the dissemination of the chemical formulas of its products, its sample products, its Material Sales Data sheets, its product mix, and its negotiated pricing arrangements with its customers. Further, the Court finds that for the reasons established by the testimony of the witness Steen, that the plaintiff Penetone had a strong interest in maintaining the secrecy of that information and guarding against dissemination to its competitors.

Further, the plaintiff expended a great deal of thought and effort in securing the secrecy of the information in question. Lastly, the Court finds that Penetone's competitors would find it much more difficult, in terms of time and expense, to duplicate the plaintiff's products and compete with the plaintiff as the seller of those products without the information which the plaintiff alleges to be trade secrets. The Court thus finds that this information rises to the level of trade secrets as defined by Ohio Law and are worthy of protection. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–475, 94 S.Ct. 1879, 1882–1883, 40 L.Ed.2d 315 (1974); *CPG Products Corp. v. Mego Corp.*, 502 F.Supp. 42, 44 (S.D.Ohio 1980). The Court further finds that the evidence establishes that the defendant Scot Laboratories relied upon such information in producing the products which the defendant Paolucci sold to LTV Steel.

■ The Court further finds that preliminary injunction is an appropriate form of relief in this case. The Court concludes from the evidence as seen thus far that the plaintiff has a substantial likelihood of prevailing on the merits of its case. "Moreover, this is a complex case in which [plaintiff] has raised questions going to the merits which are serious and substantial and present fair grounds for litigation." *CPG Products Corp.*, *supra*, at 45 (citations omitted). The Court also finds that the plaintiff will suffer irreparable injury if the requested preliminary injunctive relief is not granted. Evidence before the Court establishes that plaintiff's sales of its products to LTV Steel constituted a large percentage of plaintiff's income in previous years and up to the last two months. Further, the evidence establishes that in the last two months, the plaintiff's sales to LTV have substantially declined. Additionally, the Court finds that the issuance of a preliminary injunction will uphold the public policies behind the enactment of Ohio Rev.Code § 1333.51. Moreover, when traditional equitable considerations are balanced, per Judge Aldrich's directive in *Van Driver's Union Local No. 392, supra*, the Court concludes that if not granted, plain-

tiff's threatened injury will be irreparable, and that public policy will not be offended by the issuance of this injunction. On balance, the Court concludes that the plaintiff employer's right to enjoy the use of trade secrets outweighs the defendants' right to earn their livelihood by benefitting from those secrets. *See G T I Corp., supra*, at 768.

For the reasons above stated, the Court enjoins the defendants from soliciting and obtaining business from plaintiff's former or current customers by utilizing the plaintiff's trade secrets. Defendants are also enjoined from disclosing plaintiff's trade secrets to third parties, and from using plaintiff's trade secrets to manufacture and market defendants' products.

■ Further, the Court finds that the evidence establishes that the storage tanks regarded as Penetone's storage tanks on the property of the defendant Scot Laboratories were erected and are owned by the plaintiff Penetone and are currently being converted by the defendants. The Court thus enjoins the defendants from converting plaintiff's tanks during the pendency of this action.

IT IS SO ORDERED.

## JUDGMENT ENTRY

For the reasons stated in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the defendants are enjoined from soliciting and obtaining business from plaintiff's former or current customers by utilizing the plaintiff's trade secrets. Defendants are also enjoined from disclosing plaintiff's trade secrets to third parties, and from using plaintiff's trade secrets to manufacture and market defendants' products. The Court further enjoins the defendants from converting plaintiff's tanks during the pendency of this action.

The Court orders that the $5,000.00 bond previously submitted by the plaintiff be increased to $25,000.00. Plaintiff shall pay

said bond to the Clerk of Courts by December 2, 1985 at 4:00 p.m.