[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF LAW ON DEFENDANT'S MOTION TO STRIKE
This is a suit brought by the Pratt and Whitney Division of United Technology against Turbine Kinetics Inc. and various individuals who own and/or conduct the business of that company. CT Page 2180
The defendants have filed a motion to strike all four counts of the amended complaint, a paragraph in the fourth count, and the plaintiff's request for punitive damages and attorney's fees. All four counts rely on the factual allegations made in the first 19 paragraphs of the First Count.
In deciding a motion to strike a complaint and its claims for relief, a trial court must "take the facts to be those alleged in the . . . complaint construed in a manner most favorable to the pleader. Amodio v. Cunningham, 182 Conn. 80), 82 (1980).
Paragraph 2 alleges that the defendant company is a competitor of the plaintiff. Paragraphs 6 and 7 claim the plaintiff designed engine parts in 1987 and 1989. The designing and redesigning of these parts involved a substantial investment. The design of these parts is embodied in "parts drawings" (para. 8). Paragraph 9 states these "parts drawings" are highly confidential and proprietary and according to the plaintiff are its trade secrets and are the subject of reasonable security measures. The parts drawings contain the following legend
 "This document is the property of United Technologies Corporation and is delivered on the express condition that it and the information contained in it are not to be used, disclosed, or reproduced in whole or part, for any purpose without the express written consent of United Technologies Corporation; and that no right is granted to disclose or so use any information contained in said document. These restrictions do not limit the right to use information obtained from another source."
Paragraph 10 alleges these parts drawings "are not available or known to" the plaintiff's competitors and are not accessible to them "through proper means."
The next several paragraphs allege that the Federal Aviation Administration (FAA) is responsible for insuring airworthiness — engines and spare parts cannot be sold without the agency's approval. The FAA issues a "Type Certificate" to the original equipment manufacturer (OEM) certifying airworthiness of the engine design and a Production Certificate authorizing manufacture of engines and parts to the approved design.
The FAA grants Parts Manufacturer Approval (PMA) to other spare parts manufacturers approving the design of their spare CT Page 2181 parts and authorizing them to manufacture the parts for sale and installation on FAA Type Certificate engines.
Design approval for PMA can be obtained either on (1) tests and computations grounds, or (2) on the basis of identicality. For approval on the first ground, reports and computations must be submitted to the FAA to show design of the part meets airworthiness standards. For approval on identicality grounds, the applicant need only submit its design and parts drawings of the OEM to establish the designs are identical.
In paragraph 15 it is alleged the defendant has applied for and received PMA on the basis of identicality on two parts numbers which correspond to the parts numbers of the plaintiff and utilized the plaintiff's proprietary parts drawings in obtaining PMA on these parts.
Paragraph 16 alleges the defendant, since obtaining PMA approval, has sold the above-referenced parts in direct competition with the plaintiff's parts. The use of the plaintiff's drawings to obtain PMA on identicality grounds was of significant economic value to the defendant company since it eliminated the need for the defendant to perform and prepare time consuming and costly tests and computations.
Paragraph 18 asserts that the plaintiff has never authorized the defendant to possess or use its trade secrets, including parts drawings, for any purpose.
Paragraph 19 alleges the defendant knew the latter was the case and that the parts drawings were the plaintiff's trade secrets. It also alleges the defendant knew it had acquired the drawings through improper means.
In paragraph 20 the plaintiff then. alleges the defendant thereby wilfully and knowingly misappropriated the plaintiff's trade secrets.
(1)
The First Count alleges that by engaging in the just mentioned conduct the defendants have misappropriated the plaintiff's trade secrets in violation of our Uniform Trade Secrets Act, C.G.S.A. § 35-50 et. seq. CT Page 2182
The defendants argue that the first count is legally insufficient on its face. They base their argument on a reading of the legend attached to the parts drawings and by reference to several paragraphs of the complaint.
The argument seems to go that the restrictions on use of the parts drawings referred to in the legend as made clear in the last sentence, "do not limit the right to use information obtained from another source." The complaint asserts the plaintiff never authorized the defendant to possess or use its drawings. "Significantly", argue the defendants, Pratt never alleges that Turbine Kinetics obtained the drawings from the plaintiff Pratt. Since the legend permits Pratt's information to be utilized if "obtained from another source", the legend in effect is saying when the information is not received from Pratt,ipso facto, it's from "another source" and this demonstrates that the information was acquired through "proper" means.
The court finds this position difficult to accept. Pleadings must be read in a manner most favorable to the non-moving party and common sense interpretations should be given passages of the English language even when they involve technical matters and complicated relationships between competitors.
The legend says the plaintiff's drawings and the information can't be used without the plaintiff's written consent of course, this restriction could and would not apply if the information was "obtained from another source." The most logical meaning of this language is to say it gives simple recognition to the fact that if another person or company develops the information on their own or without relying on the plaintiff's drawings, they wouldn't have to obtain the plaintiff's written consent before using the information to their own advantage.
In a literal sense, what could "obtained from another source" mean. It certainly could mean, given the flexibility of the English language, that if a competitor stole the information or bribed an employee of the plaintiff, that would be "another source." But, if access to the information in this way was access by means of another source and, ipso facto, this means the acquisition of the information was "proper", why did the plaintiff engage in the silly endeavor of putting the legend on the drawings in the first place.
I suppose there is another possibility — the defendant could CT Page 2183 say we admittedly didn't get written consent to use the information, we didn't develop it on our own, we didn't steal or bribe to get it, we just opened the mail box one day and there it was. The possibility of such a conjecture, however, doesn't preclude the plaintiff from alleging, in manner not inconsistent with any rational reading of the legend, that whatever the legend might mean it certainly would not prevent our relying on its protection to secure relief from some person or company that acquired the information by improper means such as stealth. That's the allegation in the complaint, nothing in the legend or in the complaint makes the allegations in the complaint internally contradictory to each other or with a common sense interpretation of the legend.
I will not grant the motion to strike the first count or any of the other counts on the first argument raised by the defendants.
(2)
The defendants also argue that the second count (unfair competition), third count (interference with financial expectations), and the fourth count (unfair trade practices under CUTPA) should be stricken because they are preempted under federal law. Each of the counts incorporates the factual allegations of the first count. The federal preemption claim addresses the subject matter jurisdiction of the court.
Under federal law certain designs are patentable. Section35 U.S.C. § 101 provides that:
 "[W]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter or any new and useful improvement thereof may obtain a patent therefor, subject to the conditions and requirements of this title."
In Sears. Roebuck Co. v. Stiffel Co., 376 U.S. 225 (1964), it was held that a company whose design and mechanical patents were held to be invalid for want of invention cannot rely on state unfair competition law to obtain an injunction against copying its product or an award of damages for such copying. Such state remedies presents a conflict with the exclusive federal power to grant patents only to true inventions and then only for a limited time. If an article is unpatented, the court held, it is in the public domain and may be freely copied subject to state CT Page 2184 police power, for example, as to labeling where this is appropriate to prevent deception as to source.
At pages 376 U.S. 230-231, the court reasoned as follows:
 "Thus the patent system is one in which uniform federal standards are carefully used to promote invention while at the same time preserving free competition. Obviously a State could not, consistently, with Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents . . . . Just as a State cannot encroach upon the federal patent laws directly, it cannot under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws . . . . An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so. What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel.
This it had every right to do so under the federal patent laws. . . . To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public." (emphasis added)
Given the broad purposes sought to be achieved by the federal patent law, I cannot accept what the plaintiff regards as a "crucial distinction" — that is, that "Pratt Whitney is not alleging that the defendants copied its drawings, but rather that the defendants' wrongful use of those drawings constituted unlawful misappropriation" (page 6 of plaintiff's memorandum in opposition to motion to strike). In Sears Roebuck Co. itself the plaintiff, alleged in the first count that Sears had infringed Stiffel's patents and in the second count that by selling copies of Stiffel's lamp Sears had caused confusion in the trade as to the source of the lamps and thus had engaged in unfair competition under state (Illinois) law, 376 U.S., at page 226.
Under 35 U.S.C. § 271 (a), the patent law gives a patentee the right to bar others from using or selling the patented invention throughout the country and anyone who so acts infringes the patent. Infringement liability can be imposed on CT Page 2185 any person or company who makes, uses or sells a patented device. Given the corollary policy of the patent laws that an unpatentable matter should be allowed to circulate in the market place, how can a state, consistent with the objectives of the patent law, permit a remedy for copying, use or sale of the unpatentable design.
However, at this juncture in the case I believe a motion to strike based on federal preemption grounds is inappropriate. The federal patent laws and the policy behind them was not intended to and does not occupy the whole universe of appropriate legal remedies that might be available to a business to deny access to the outside competitive world of certain devices or designs.
In other words the factual allegations as to all of these counts rest on a claim of a violation of Pratt Whitney's trade secrets or more broadly of any rights created by the legend attached to various Pratt Whitney designs. The question of whether state remedies designed to protect any interest the plaintiff has in protecting the above referenced interests is void under the Supremacy Clause involves a consideration of whether any such state remedy "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Hines v. Davidowitz, 312 U.S. 52, 67 (1941). It is necessary to examine the purpose of the patent law and remedies designed to protect trade secret type interests.
The patent laws give inventions a 17 year exclusion period to encourage invention and the spread of new products and manufacturing processes. In fact, 35 U.S.C. § 112 requires that a patent application include a full and clear description of the "invention" and of the manner and process of making it and using it. This requirement exists so that others may construct and use the patented item or information after expiration of the patent and to inform people and competitors during the life of the patent of the limits of or the monopoly asserted so that it can be known which features may be safely used manufactured without a license and which may not. Schriber-Schroth Co. v.Cleveland trust Co., 305 U.S. 47 (1938). Patent law also has another important ancillary purpose federal law requires that all ideas in general circulation be dedicated to the common good and the states cannot remove such ideas from the public domain.Lear Inc. v. Adkins, 395 U.S. 653, 668 (1969); Kewanee Oil Co. v.Bicron Corp., 416 U.S. 470, 481 (1973). CT Page 2186
Trade secret law and the policies behind it have a different general purpose. Various remedies designed to protect infringement of trade secrets are designed to maintain standards of commercial ethics, "`good faith and honest, fair dealing, is the very life and spirit of the commercial world'," id. at416 U.S., pp. 481-482. As the Kewanee court goes on to say in citingA. O. Smith Corp. v. Petroleum Iron Works, 73 F.2d 531, even though a discovery may not be patentable that does not
 "destroy the values of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself (sic) paying the price in labor, money, or machines expended by the discoverer." A. O. Smith Corp.,
at 73 F.2d p. 539.
Thus, if a design or invention is not patentable but is still a trade secret properly so defined, then, since the policies of the patent law do not conflict with the interests sought to be protected by infringement of trade secret material, then the states can provide remedies of various types to protect such material without violating the Supremacy Clause of the federal constitution.
A trade secret has been defined in several ways. The Kewanee
court notes one definition from Restatement (Second) Torts § 757, comment (b), which has since been removed from the Restatement as beyond the scope of tort law but which is still serviceable.
 "(a) trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him (sic) an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating, or preserving materials, a pattern for a machine or other device, or a list of customers." Adopted in B. F. Goodrich Co. v. Wohlgemuth, 192 N.E.2d 99, 104
(1963).
Since the pleadings must be read in a light most favorable to the non-moving party and since the complaint alleges the violation of a trade secret interest, I cannot say that state remedies designed to protect against and award damages for violation of that interest even though it is not patentable is CT Page 2187 federally preempted. Neither do I believe a motion to strike is the proper vehicle to determine whether a trade secret interest is involved here that might otherwise be protected by state law without any derogation of federal patent law.
(3)
The defendants' third claim is that the counts of unfair competition, interference with financial expectancies and violation of CUTPA must be stricken since when the gravamen of the complaint is in effect misappropriation of trade secrets, then the Uniform Trade Secret Act (UTSA) § 35-50 C.G.S.A., et. seq., provides the only remedy.
The defendants' argument is based on a provision of the act which says, at § 35-57 (a):
 "Unless otherwise agreed by the parties, the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret."
There are no appellate court interpretations of the meaning of this language in our state.
The defendants have cited two federal district court cases interpreting trade secret acts with language similar to our own.Hutchinson v. KFC Corp., 809 F. Sup. 68 (D. Nev., 1992); CoulterCorp. v. Lienert, 869 F. Sup. 732 (E.D. Mo., 1994). Both these cases have interpreted the above-referenced statutory language as requiring that where the basis of the complaint was misappropriation of trade secrets, the only remedy is the trade secrets act and other common law actions or statutory remedies cannot be sued upon. Unfortunately neither case provides anything more than conclusory reasoning for its position.
When our legislature wanted to make a particular statutory scheme the only vehicle for recovery in a particular area of the law it certainly knew how to do so. For example § 52-572n of our Products Liability Law says that: "A product liability claim . . . may be asserted and shall be in lieu of all otherclaims against product sellers. for harm. caused by a product."
Connecticut Superior Court decisions have held that CUTPA provides a parallel remedy to UTSA and causes of action under CT Page 2188 both statutes may stand together. Vantage Computer Systems Inc.v. The Leverage Grove Inc. eta, 4 CSCR 551 (1989); Legal ServicePlans Inc. v. Heneghan. Pilcor. Kennedy Allen et al,2 Conn. L. Rptr. 435 (1990); Trox Ler Electronic Laboratories Inc. v.Palilla, 1995 W. L. 299599 (Conn.Super.).
It is difficult to understand what the legislature meant by saying "conflicting" remedies will be superseded. How is the word "conflicting" to be interpreted? Does it mean "conflicting" only in terms of the type or amount of damages that may be awarded'. Does it refer to the fact that some remedies have different limitation periods (c.f., § 35-56)? Is it necessary to throw out the whole cause of action or can any apparent "conflict" be resolved by jury instructions, for example, making any damages award comply with. UTSA provisions?
A cause of action based on interference with financial expectations is, as the plaintiff notes, an intentional tort; a UTSA claim can be based on negligence. UTSA unlike an unfair competition claim does not require a showing of competition. Do these differences require a finding that these remedies are "conflicting" with UTSA. Such an argument might arguably pass muster if the non-UTSA remedy required the plaintiff to meet a lesser burden to prevail than a UTSA claim but it does not appear to make sense to say such remedies are "conflicting" when theplaintiff asserting them assumes a heavier burden with a particular alternative form of relief other than a UTSA claim. In other words, what does conflicting mean in this context — conflicting because not uniform or conflicting in that interests sought to be protected under UTSA would otherwise be watered down or unfairly expanded if separate causes of action were allowed besides UTSA?
It is a commonly stated proposition that the same underlying facts can give rise to various causes of action. In other words the plaintiff can plead his cause of action in a variety of ways advancing alternative theories of recovery. Without a trial record or at least the record that might be afforded to the court at a summary judgment hearing, c.f., Micro Display Systems Inc.v. Axtel Inc., 699 F. Sup. 202, 205 (D. Minn. 1988), I do not believe the granting of a motion to strike on this ground is appropriate. The legislative history of UTSA, CUTPA and the common law theories of action will have to be examined in light of that record to determine whether non-UTSA remedies "conflict" with the UTSA remedy. CT Page 2189
(4)
The defendants seek to strike a single paragraph (21a) in the Fourth Count (Unfair Trade Practices) of the complaint.
I do not think it is appropriate to use a motion to strike to attack the subsection of a paragraph in one count of a complaint.
In any event, the defendants move to strike this paragraph based on an argument that the paragraph in question alleges that the defendants' acts were deceptive because they tended to mislead the FAA as to how the defendants came into possession of parts drawings it submitted to the FAA for PMA. In other words, the FAA was not aware that the defendants may not have been properly in possession of the material it submitted to the FAA.
The defendants argue that the FAA regulations only require that a PMA application must include certain information and where and how the applicant got the material submitted is not considered in the PMA application process. How can I consider FAA regulations on a motion to strike that are not part of the pleadings? I find it hard to believe that even though the FAA PMA application regulations are silent on this matter that the agency would not consider an application to be tainted which was based, for example, on stolen or improperly procured material. Also, I do not believe the Supremacy Clause would prevent a state from using its police power to provide injunctive relief against a party who secured PMA improperly from the FAA and was thereby demonstrably injuring a competitor; if that is so why wouldn't other state remedies be available, c.f., Boeing Co. v. SierracunCorp., 738 P.2d 665, 672, 681 (Wash. 1987). In any event, the last portion of paragraph 21a says the defendants' practices in addition to being deceptive toward the FAA "have a tendency and capacity to deceive the public as to whether the defendants received PMA through proper means." This is a separate and distinct claim having nothing to do with PMA application requirements of the FAA and assets a separate wrong against the public that may be entitled to a CUTPA remedy.
The motion to strike paragraph 21a is denied.
(5)
The defendants move to strike the claim for relief of CT Page 2190 punitive damages and attorney's fees. I denied the motion to strike the First Count and the Fourth Count; both UTSA and CUTPA provide for attorney's fees and punitive damages.
As to the other counts, to determine whether punitive damages or attorney's fees may be claimed, the factual allegations of those counts must be examined. As noted the Second and Third Counts incorporate the first 19 paragraphs of the First Count.
The Third Count in paragraph 20 alleges the defendants intentionally interfered with the plaintiff's financial expectations.
As to punitive damages, our court has said the following inVenturi v. Savitt Inc., 191 Conn. 588, 592 (1983).
 "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."
Also see West Haven v. Hartford Ins. Co., 221 Conn. 149, 160-161 (1992).
Giving the allegations of the complaint their most favorable reading, they seem to adequately provide a basis for a claim for punitive damages and attorney's fees. Paragraph 9 refers to parts drawings of Pratt which are highly confidential proprietary and constitute trade secrets.
Paragraph 2 defines the defendant company as a "competitor" of the plaintiff and paragraph 10 alleges the parts drawings are not available or known to Pratt's competitors and not accessible to them through proper means. Paragraph 15 claims the defendant company used the plaintiff's parts drawings to obtain PMA from the FAA although the plaintiff never authorized such use of its trade secrets (para. 18). Paragraph 19 alleges the defendant Turbine Kinetics Inc. knew the parts drawings were trade secrets, that it was not authorized to possess or use them and that it had acquired them through improper means.
These allegations certainly allege intentional and wilful actions and if proven would allow a jury to so characterize the defendants' activities. As noted the Third Count in paragraph 20 alleges the defendants "intentionally interfered with Pratt 
Whitney's financial expectations." CT Page 2191
The motion to strike as directed to all counts and as to portions of the prayer for relief is denied.